Michael V. COSTELLO, Robert K. Celestineo, and all those similarly situated, Plaintiffs,

v.

Louis L. WAINWRIGHT, as Director of the Division of Corrections et al., Defendants.

United States of America, Amicus Curiae.

Nos. 72–109–Civ–J–S, 72–94–Civ–J–S.

United States District Court, M. D. Florida, Jacksonville Division.

Feb. 11, 1980.

Tobias Simon, Miami, Fla., for plaintiffs.

Margie A. Utley, Dept. of Justice, Civil Rights Div., Washington, D. C., for amicus curiae.

---

12. Judgment may appropriately be entered in favor of the non-moving party. *See* 10 C. WRIGHT & A. MILLER § 2720 (1973).

Jim Smith, Atty. Gen., Sydney H. McKenzie, III, Chief Trial Counsel, William C. Sherrill, Jr., Dept. of Legal Affairs, Tallahassee, Fla., for defendants.

## ORDER APPROVING SETTLEMENT AGREEMENT

CHARLES R. SCOTT, Senior District Judge.

This cause is before the Court for approval of the settlement agreement submitted by the parties on October 23, 1979 (See Appendix). To satisfy the requirements of Fed.R.Civ.P. 23(e), notice of the proposed settlement was given to members of the plaintiff class and they, as well as the United States, as amicus curiae, were permitted to file written objections or comments.

The United States submitted a memorandum outlining several objections to the proposed settlement agreement of November 26, 1979. Plaintiffs and defendants then filed written responses to the objections. Of the approximately 20,000 inmates included in the plaintiff class, less then 50 filed written objections to or comments on the settlement agreement. Moreover, several of those who did respond expressed support for the settlement and urged the Court to approve it.

At the hearing held on February 1, 1980, the Court reviewed the objections of the inmates as well as those raised by the United States. The objections filed by the inmates, which in substance do not vary substantially from those of the United States, were responded to by counsel for both plaintiffs and defendants.

■ The Court has thoroughly reviewed the terms of the settlement agreement and the exceptions taken by the United States and some members of the plaintiff class, as well as the law relating to the issue of overcrowding. Toward its duty of determining that the agreement is fair and reasonable and in the best interests of all those who will be affected by it, *see Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1168–69 (5th Cir. 1978); *Cotton v. Hinton*, 559 F.2d 1326, 1330–31 (5th Cir. 1977), the Court makes the following findings:

■ 1. Notice to class members was given in accordance with the Court's order of October 25, 1979. Notice was also provided by counsel for plaintiffs visiting several institutions to meet with inmates and to answer questions regarding the settlement proposal. The Court finds the notice which was given to be reasonable and adequate under Fed.R.Civ.P. 23(e).

2. This case began by complaint filed February 11, 1972, which was amended on January 2, 1973, and again on April 24, 1973. The second amended complaint alleges in paragraphs 12, 13, 14, 15, and 16 that the entire prison system is so severely overcrowded as to cause substantial harm to inmates in violation of the Eighth Amendment prohibition against cruel and unusual punishment. The complaint further alleges that the inmates do not receive minimally adequate medical care in alleged violation of the Eighth Amendment.

3. On May 22, 1975, the Court entered a preliminary injunction with respect to the claim of "overcrowding". An appeal was taken from that order, and a panel of the Fifth Circuit Court of Appeals affirmed the Court. *Costello v. Wainwright*, 525 F.2d 1239 (5th Cir. 1976). Subsequently, rehearing *en banc* was granted by the Fifth Circuit and the preliminary injunction was reversed on the grounds that the injunction was one required to be issued by a three-judge court, *Costello v. Wainwright*, 539 F.2d 547 (5th Cir. 1976). In the Spring of 1977, however, the United States Supreme Court reversed the *en banc* opinion of the Fifth Circuit Court of Appeals on the three-judge court issue thereby reinstating the earlier decision by a panel of the Fifth Circuit affirming the preliminary injunction. *See Costello v. Wainwright*, 430 U.S. 325, 97 S.Ct. 1191, 51 L.Ed.2d 372 (1977); *Costello v. Wainwright*, 553 F.2d 506 (5th Cir. 1977).

4. Upon entry of the preliminary injunction, state officials responded in the Summer of 1975 by conducting a comprehensive space-utilization survey of all prison facili-

ties. As a result of this space survey, management standards were established for the "design" and "maximum" capacities of the institutions.

5. Since 1972 when this litigation began, substantial changes have occurred in the Florida prison system. The number of inmates has increased from approximately 10,000 to approximately 20,000. The number of institutions has also increased to 24.

6. In the eight years since this litigation began, the Legislature of the State of Florida has provided very substantial increases in funding of the prison system. Two significant indices of substantial and real improvement can be illustrated by a comparison of funding for operation of the prison system in 1972 compared to funding for fiscal year 1980–81. In 1972–73, the prison system was allocated $35,935,680.00 for operations. By 1980–81, pursuant to adoption of the biennial budget, this will increase to $151,446,672.00, an increase which more than accounts for increases in population and inflation. Moreover, the Legislature of the State of Florida has, since 1972, appropriated roughly $141,000,000.00 to construct new prisons in the State of Florida.

7. The Court has not been unaware of the immensity of the problems facing defendant and the State of Florida during the unprecedented growth in inmate population from 1972 to 1977, nor of the seriousness of the responsibilities of the state to provide constitutionally adequate shelter and care for those committed to the custody of the correctional officials. While the Constitution guards against any condition that denies a human being the essentials of life, the Court also recognizes that the administration of Florida's prison system is first and foremost the responsibility of the defendant, Louie Wainwright, the Governor, and the Legislature of the State of Florida.

8. The terms of the settlement agreement provide generally that, although any individual institution may be at its "maximum capacity", the total number of inmates housed in the institutions under the control of the Department of Corrections will not exceed "design capacity" plus one-third. The settlement agreement also provides that certain facilities will no longer be used as sleeping quarters for inmates. Although no interim timetable is specified, the settlement proposal provides that these conditions will be met no later than July 1, 1985. In return for these covenants, the settlement agreement provides that the members of the plaintiff class release defendants from any liability for damages arising out of allegations of "overcrowding" and withdraw the allegations of paragraphs 12, 13, 14, 15, and 16 of the present complaint.

9. When these terms are considered in light of the prevailing law on the issue of "overcrowding", the settlement agreement is fair and reasonable. It is unlikely that further litigation of this issue would result in imposing substantially different requirements upon the defendants.

10. The settlement agreement is in the best interests of those who are subject to it and there is absolutely no evidence or intimation of collusion between any parties to the agreement. Further protracted litigation of the "overcrowding" issue would not serve the interests of any of the parties to this suit.

It is therefore,

ORDERED and ADJUDGED:

1. The settlement agreement and stipulation of dismissal are approved.

2. Pursuant to the settlement agreement and stipulation of dismissal, all claims herein with respect to "overcrowding", and in particular paragraphs 12, 13, 14, 15, and 16, and paragraph 1 of the prayer for relief, all of the second amended complaint are dismissed with prejudice.

3. The parties shall comply with the terms of the settlement agreement, which does not include Section V of the settlement agreement, and the settlement agreement terms are incorporated herein by reference.

4. Beginning on July 15, 1980, and on July 15 of each year thereafter until July 15, 1985, the defendant or his successor shall file with the Court a report of:

(a) design and maximum capacities available for occupancy on July 1,

(b) system maximum capacity on July 1,

(c) changes to capacities since the last report, and

(d) actual population on July 1.

5. Upon motion of either party, or upon petition of any member of the class of plaintiffs, the Court may at any time hold further hearings to determine compliance with this consent order and judgment and with the settlement agreement, and may enter such other orders as may be necessary and within the Court's jurisdiction to enforce the provisions of this order and the agreement.

## APPENDIX

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
CASE NOs. 72–109–Civ–J–S
72–94–Civ–J–S

MICHAEL V. COSTELLO, et al.,
 Plaintiffs,

v.

LOUIS L. WAINWRIGHT, et al.,
 Defendants,

UNITED STATES OF AMERICA,
 Amicus Curiae. _____/

## SETTLEMENT AGREEMENT

This Settlement Agreement is entered into by the parties to this litigation in order to resolve and finally settle all disputes and controversies arising out of the claim asserted by Plaintiffs of alleged "overcrowding" within the prison system of the State of Florida.

The parties to this Settlement Agreement are:

(1) Plaintiffs, individually and as representatives of the class of all persons who are or who hereafter will be committed to the custody of the Defendant or the Department of Corrections, or any successor agency, by and through counsel.

(2) Defendant, Louie L. Wainwright, as Secretary of the Department of Corrections by and through counsel.

This Settlement Agreement is supported as indicated herein by Bob Graham, Governor, State of Florida, who is not, however, a party to this Settlement Agreement or to this litigation.

### I.

### STATUS OF THE CASE

This case began by complaint filed February 11, 1972, which was amended on January 2, 1973, and again on April 24, 1973. The second amended complaint alleges in paragraphs 12, 13, 14, 15, and 16 that the entire prison system is so severely overcrowded as to cause substantial harm to inmates in violation of the Eighth Amendment prohibition against cruel and unusual punishment. Relief is requested as to alleged "overcrowding" in paragraph 1 of the prayer for relief. The complaint further alleges that inmates do not receive minimally adequate medical care in alleged violation of the Eighth Amendment.

On May 22, 1975, the Court entered a preliminary injunction with respect to the claim of "overcrowding." An appeal was

taken from the order. On January 15, 1976, a panel of the Fifth Circuit Court of Appeals affirmed the Court. Rehearing en banc was granted then by the Fifth Circuit, and the preliminary injunction was reversed on the grounds that the injunction was one required to be issued by a three-judge court. Subsequently, in the spring of 1977, the United States Supreme Court reversed the en banc opinion of the Fifth Circuit on the three-judge court issue, thereby reinstating the Fifth Circuit's earlier panel decision which had affirmed the preliminary injunction.

In the seven years since this litigation began substantial changes have occurred in the Florida prison system. The number of inmates has increased from 10,000 to 20,000. Major improvements have also been made to the prison system. Health care appropriations have increased from $382.33 per year per inmate in FY 1972–73 to $668.46 per year per inmate in FY 1980–81. The total amount appropriated for operation of the prison system has increased from $35,935,680 in FY 1972–73 to $151,446,672 in FY 1980–81. Finally, approximately $141 million has been appropriated by the Legislature since FY 1971–72 for construction of new prisons.

Subsequent to the Court's preliminary injunction, in the summer of 1975 the Department of Corrections and the Department of Administration conducted a joint space utilization survey to measure, describe, and catalogue all buildings and structures in the Florida prison system. As a result of that survey, standards were established for "Design Capacity" and "Maximum Capacity" for individual institutions under the jurisdiction of Defendant. The parties agree that these standards have greatly improved the management of the prison system and provide a useful basis upon which to predicate settlement of the dispute concerning alleged "overcrowding."

By orders dated March 29, 1979, and June 6, 1979, the Court has appointed medical expert witnesses to conduct a new medical care survey within the prison system to determine whether medical care delivery is presently above constitutional minimums. The report of the survey committee is not expected for several months. This Settlement Agreement, therefore, cannot and does not cover the medical care delivery issues which are unrelated to the claim of "overcrowding." The parties, however, agree to work in good faith to settle such issues, if possible, if any issues exist after receipt of the survey committee report.

## II.

### REPRESENTATIONS BY COUNSEL

Attorneys for both parties have made extensive investigation of the facts and law relevant to the disputed issue of "overcrowding" as developed over seven years of litigation, have evaluated the costs of further protracted litigation and the varying risks that attend further litigation of these difficult questions, and have concluded that the settlement embodied herein is a fair and reasonable compromise of the issues. The undersigned attorneys for Plaintiffs believe that the settlement herein is in the best interests of Plaintiffs. The undersigned attorneys for Defendant and the Defendant likewise believe and represent that the settlement herein is in the best interests of the Defendant and the State of Florida.

## III.

### DEFINITIONS

A. The "Department" shall mean the "Department of Corrections" and shall include any successor agency responsible for custody of members of Plaintiffs' class of prison inmates.

B. The "Department of Administration" shall include "the Executive Office of the Governor," or any successor agency responsible for review of executive agency budgets and supervision of management of executive agencies.

C. "Institution" shall include any single major institution, community correctional center, women's adjustment center, road prison, contracted beds at a single location, or any other similar institution which may

hereafter be created to house inmates in the custody of the Department.

D. "Facility" shall mean any single or several buildings or structures, or portions thereof, assigned a Design Capacity and Maximum Capacity, forming a part of the Design and Maximum Capacity of an institution, and actually used to house inmates for sleeping purposes.

E. The "total number of inmates in the actual care and custody of the Department within the total prison system" shall not include inmates in county jails or similar facilities awaiting initial transfer to the Department.

F. "Square feet," unless otherwise stated, relates to the square footage of floor space assigned for beds and sleeping, and does not include hallways, corridors, and dayrooms.

G. "Design Capacity" and "Maximum Capacity" are management and operational standards for individual institutions, both existing and new, which standards were established by the joint space utilization survey conducted by the Department of Corrections and Department of Administration, and successor agencies, on September 2, 1975, updated May 15, 1976, as updated thereafter continuously and as subsequently updated by joint agreement of the two departments on June 4, 1979, and as such shall continue to be jointly and continuously established by the Department of Corrections and the Executive Office of the Governor in the future applying the same principles used to set the present standards. For new institutions, these standards generally are:

1. "Design Capacity:"

a. Rooms and Cells, 40 square feet to 90 square feet: one inmate per room or cell.

b. Dormitories and rooms exceeding 90 square feet: one inmate per 55 square feet.

c. Confinement: except to the extent that separate confinement cells have been constructed, an amount of rooms or cells equal to 3% of total Design Capacity shall be deducted from Design Capacity and set aside for confinement purposes.

2. "Maximum Capacity:"

a. Rooms and Cells:

(1) 40 square feet to 60 square feet: one inmate per room or cell.

(2) Over 60 square feet to 90 square feet: two inmates per room or cell, except one inmate per room or cell at Florida State Prison or other Maximum Security Institutions or facilities which may be constructed.

b. Dormitories and rooms exceeding 90 square feet: One inmate per 37.5 square feet, with double-bunking generally along the outer walls of dormitories.

c. Confinement: except to the extent that separate confinement cells have been constructed, an amount of rooms or cells equal to 3% of total Maximum Capacity shall not be available for Maximum Capacity, and shall be set aside for confinement purposes. This will reduce Maximum Capacity by 6% since these rooms would otherwise house two inmates.

d. Management rooms: a number of rooms equal to 5% of total Maximum Capacity will be set aside as single rooms and shall accordingly be included in Maximum Capacity as rooms housing one inmate.

3. Mobile Homes: Double-wide mobile homes, to the extent used, are assigned 12 inmates at Design and Maximum Capacity. Mobile homes are used as honor dormitories as a reward to well-behaved inmates.

### IV.

### TERMS OF THE SETTLEMENT AGREEMENT

A. The Terms of this Settlement Agreement shall use the definitions provided above, where applicable.

B. System Maximum Capacity Defined.

1. System Maximum Capacity is a total capacity for the entire prison system which is agreed upon by the parties for

settlement purposes. System Maximum Capacity is the agreed total maximum capacity of all facilities considered in the aggregate. In principle, System Maximum Capacity is the total Design Capacity of all the institutions and facilities in the prison system, less certain agreed facilities, increased by one-third. The calculation shall be made by dividing total Design Capacity, as adjusted, by 3, rounding to the nearest whole number, and adding that figure to total Design Capacity.

2. System Maximum Capacity as of June 4, 1979 of facilities which will remain in the system after July 1, 1985.

System Maximum Capacity is calculated initially by reference to the summary of capacities available for occupancy on June 4, 1979, as jointly agreed upon by the Department of Corrections and Department of Administration, a copy of which is attached to this Agreement as Appendix A and incorporated herein by reference. On June 4, 1979, of those facilities which will remain in the system after July 1, 1985, System Maximum was 19,874. This figure is calculated as follows:

| | | |
|---|---:|---:|
| Total Design Capacity of all D.O.C. facilities as of June 4, 1979 (available for occupancy) | | 16,644 |
| Subtract facilities which by agreement are to be deleted from inventory by the year 1985 | | |
| MHU, UCI | 754 | |
| Annex II, RMC | 572 | |
| Silos, Hendry | 100 | |
| | 1426 | 1,426 |
| | Subtotal | 15,218 |
| Subtract facilities which by agreement, for settlement purposes, are not to be counted for purposes of increasing by one-third | | |
| FSP–MU | 1180 | |
| Mental Health and Drug Contract Beds | 70 | |
| | 1250 | 1,250 |
| | Subtotal | 13,968 |

Divide adjusted Design Capacity by 3

$13,968 \div 3 = 4,656$

| | |
|---|---:|
| Add 4,656 to Adjusted Design Capacity | 4,656 |
| | 18,624 |

| | |
|---|---:|
| Add back facilities which will remain in Design Capacity but were not utilized to reach the 133.3% figure | 1,250 |
| SYSTEM MAXIMUM CAPACITY as of June 4, 1979, of those facilities which will remain in the system after July 1, 1985 | 19,874 |

Until July 1, 1985, total Design Capacity and Maximum Capacity shall include the MHU at UCI, Annex II at RMC, and the Silos at Hendry CI, and these facilities shall also be a part of System Maximum Capacity.

3. Changes to System Maximum Capacity as new Facilities Open in the Future.

System Maximum Capacity shall increase as new facilities are opened and available for occupancy and become a part of Design Capacity and Maximum Capacity, and shall decrease to the extent that facilities are no longer used to house inmates. These changes to System Maximum Capacity shall be adjusted by adding (or subtracting) an amount equal to one and one-third of the Design Capacity of the new facility or the deleted facility. However, in the case of any institution, or particular facility at any institution, which has been designated to be a maximum security institution or facility, serving essentially the same purposes as currently served by Florida State Prison, then changes to System Maximum Capacity in such case shall be adjusted by adding (or subtracting) an amount equal to the Design Capacity of the new facility or deleted facility, and the one-third factor shall not apply.

C. Operation within agreed capacities.

1. System Maximum Capacity

On July 1, 1985, and thereafter, the total number of inmates in the actual care and custody of the Department within the total prison system shall never exceed System Maximum Capacity. Any single institution at any time may, however, operate with any number of inmates less than or equal to Maximum Capacity for the individual institution.

2. Maximum Capacity of Institutions

On the date this Settlement Agreement is approved by the Court, upon entry of an appropriate order, and thereafter, the number of inmates in the care and custody of the Department within each institution shall never exceed the Maximum Capacity of the institution, except that a single institution may exceed its Maximum Capacity for brief periods not in excess of 5 days. Within 5 days, adjustments must be made to move inmates so as to reduce inmate population at such an institution to its Maximum Capacity or below Maximum Capacity, unless the provisions of paragraph G, Suspension of Obligations, are then operative. On the date this Settlement Agreement is approved by the Court, upon entry of an appropriate order, and until July 1, 1985, the total number of inmates in the care and custody of the Department within the total prison shall not exceed the total Maximum Capacity of the prison system.

D. Changes to Design Capacity and Maximum Capacity of Institutions.

The Design Capacity and Maximum Capacity of institutions may in the future be changed if new facilities are added. These changes shall follow the same standards described in paragraph III–G above. The Department, upon approval by the Executive Office of the Governor, may also create variances at any institution from standard Design Capacity or Maximum Capacity, but such variances without Court approval may only operate to decrease Design Capacity and Maximum Capacity. Variances which operate to increase Design Capacity and Maximum Capacity above the usual standards set forth in paragraph III–G may be approved upon petition to the Court, after notice and hearing.

E. Phase-out of specific facilities.

By July 1, 1985, the Department shall no longer house inmates in the following facilities:

| Facility | Design Capacity |
| --- | --- |
| Main housing unit, UCI | 754 |
| Annex II, RMC | 572 |
| Silos, Hendry CI | 100 |
| Total | 1,426 |

By July 1, 1985, these facilities will no longer be a part of Design Capacity, Maximum Capacity, and System Maximum Capacity, but may be used for purposes other than housing inmates for sleeping purposes. On that date, System Maximum Capacity shall be reduced by 1,426, the Design Capacity of these facilities.

F. Reports to the Court.

On July 15th of each year following entry of an order approving this Settlement Agreement until and including July 15, 1985, the Department shall file with the Court a report of:

1. Design and Maximum Capacities of all institutions available for occupancy on July 1st.

2. System Maximum Capacity on July 1st.

3. Changes to capacities since the last report.

4. Actual population on July 1st.

G. Suspension of obligations during a state of emergency.

The obligations of paragraphs B, C, D, and E above shall be suspended during any state of emergency, and for a reasonable period of time thereafter, to the extent reasonably necessary to deal with the emergency. A state of emergency shall include the following or events of similar magnitude:

1. destruction, major damage, major disturbance, or major disorder at any one or several of the institutions under the jurisdiction of the department which necessitates movement of inmates to other housing areas to restore order, repair damage or otherwise care for the wellbeing of inmates;

2. destruction, major damage, major disturbance or major disorder at any one or several institutions operated by other agencies of the State, or any of its political subdivisions, the federal government, or any other state or political subdivision, necessitating the temporary housing of inmates or other persons in facilities under the jurisdiction of the Department in order to protect their health, safety or wellbeing;

3. major civilian disturbance or riot;

4. major disaster (natural or man-made);

5. war (whether declared by Congress, or major armed hostilities in the nature of war); and

6. emergencies declared by State or Federal authorities.

In the event of the occurrence of a state of emergency, Defendant may operate affected institutions or facilities for forty-five (45) days or less under such suspension of obligations without Court approval. Thereafter, such obligations may continue to be suspended upon Court approval, after petition by Defendant. The Court may alter the agreed schedules and dates of the foregoing obligations to account for such periods of suspension due to a state of emergency.

H. The Settlement Agreement does not admit or establish constitutional standards.

The parties expressly agree that this Agreement is not an admission of constitutional violations, nor does this Agreement establish constitutional minimum standards with respect to the claim of "overcrowding." The parties have entered into this Agreement solely as a means to put a reasonable end to the controversy, to avoid the costs, time, and risks which litigation would involve for both parties, and this Agreement should not be construed in any manner as establishing constitutional standards, minimums, or thresholds of constitutional harm to Plaintiffs. Neither this Agreement nor the Judgment that may follow from this Agreement, nor anything contained herein or therein, shall constitute or be construed as evidence or an admission or adjudication with respect to any fact or conclusion of law with respect to any matter alleged in or arising out of the complaint or of any wrongdoing or misconduct on the part of the Defendant or the Department, or any of its agents.

I. The Settlement Agreement, Stipulation of Dismissal, and Consent Order and Judgment are binding only upon the parties to this litigation.

This Settlement Agreement, the Stipulation of Dismissal, and the Consent Order and Judgment, are binding only upon the parties to this litigation on the date that this Settlement Agreement is executed, and upon official successors to such parties.

J. Non-waiver of defenses.

Defendant does not herein waive any defense available to him or any agency or agent of the State of Florida now or in the future. In particular, Defendant does not by entering upon this Agreement waive the defense of the Eleventh Amendment or any immunity on behalf of himself or any agent or agency of the State of Florida.

K. Effect of the Settlement Agreement upon pending issues of delivery of medical care.

This Settlement Agreement does not attempt to resolve the issues regarding delivery of medical care to Plaintiffs and Plaintiffs' class. However, this Settlement Agreement, the Stipulation of Dismissal, and the agreed Consent Order and Judgment shall forever settle and resolve any claim that "overcrowding" in the prison system has harmed or impaired or is harming or impairing the physical or mental health of Plaintiffs and Plaintiffs' class. Any pending claim that there are too few health care delivery resources for the number of inmates shall be addressed as an aspect of delivery of health care and not as an issue of "overcrowding."

L. The Settlement Agreement will be effective upon approval by the Court.

This Agreement shall not be effective until finally approved by the Court under the provisions of Rule 23(e), Federal Rules of Civil Procedure. Should the Court disapprove any portion of this Agreement, or should the parties fail to execute the Stipulation of Dismissal within a reasonable time, or should the Court determine not to enter the agreed Consent Order and Judgment, then the obligations under this Agreement shall terminate, this Agreement shall be void, and no portion of this Agreement shall be used against or prejudice either party in future portions of this or any other action.

M. Entry of a Consent Order and Judgment.

Upon approval of this Settlement Agreement, the parties agree to the entry of the Consent Order and Judgment which is attached hereto as Appendix B, and incorporated herein by reference. The Consent Order and Judgment may be enforced by the Court in the same fashion that other equitable orders of the Court are enforced. Violation of the Settlement Agreement or the Consent Order may be enforced by equitable relief. Violation of the Settlement Agreement or the Consent Order shall not be enforced by, or be the basis of, or give rise to, or be evidence of, liability for damages with respect to any member of the class of Plaintiffs, whether pursuant to a claim of "overcrowding" or any other claim or cause of action.

N. Effect of the Consent Order and Judgment upon future claims based upon "overcrowding."

Hereafter the operation of the prison system at any level at or under System Maximum Capacity and operation of any single institution or housing facility at or under Maximum Capacity shall be a complete defense to any claim for damages, equitable relief, or relief of any kind, by any individual inmate or class of inmates, based upon harm alleged to be caused by or arising out of, in whole or part, allegations of "overcrowding" of any housing facility, institution, or the entire prison system. Any violation of the Settlement Agreement or the Consent Order shall not be the basis of, or evidence of or give rise to, any liability for damages upon a future claim based upon "overcrowding" or any other claim or cause of action. This paragraph shall not apply to any other future claim which is based upon grounds other than upon allegations of "overcrowding," or is based upon grounds other than upon allegations of violation of the Settlement Agreement or the Consent Order.

O. Execution of Stipulation of Dismissal.

Plaintiffs, individually and on behalf of the certified class of present and future inmates agree to execute the Stipulation of Dismissal with prejudice of the claims of "overcrowding" contained in paragraphs 12 through 16 and paragraph 1 of the prayer for relief of the second amended complaint, effective upon entry of the Consent Order and Judgment. The Stipulation of Dismissal is attached hereto and incorporated herein by reference as Appendix C.

P. Release.

Plaintiffs hereby release Defendant, the Department of Corrections, and any present or former employee or agent of the Department of Corrections from all claims, demands, actions, causes of action, federal, state, administrative, or otherwise, based upon allegations of harm caused by "overcrowding" in the entire prison system, an institution, or a facility, occurring at any time prior to approval of this Agreement by the Court. This release shall not apply to claims based upon allegations other than "overcrowding."

Q. Agreement not to appeal.

In consideration of the foregoing promises, the parties each agree not to appeal the Consent Order and Judgment which is attached as Appendix B upon entry of such Order by the Court.

R. Notice to class members pursuant to Rule 23(e), Federal Rules of Civil Procedure.

The parties agree that reasonably adequate notice of the terms of this compromise and settlement may be afforded to all class members as required by Rule 23(e), Federal Rules of Civil Procedure, by means of the Notice of Class Members attached hereto as Appendix D. Reasonable notice may be afforded by posting this Notice in all housing facilities under the jurisdiction of Defendant. Defendant agrees to bear the cost of posting such notice in this manner.

The parties further agree that counsel for Plaintiffs may meet with inmates to answer questions concerning the Settlement Agreement. Defendant agrees to give reasonable notice to inmates as to the dates and times

of counsel's visit to particular institutions, and to arrange for facilities in which counsel may meet with inmates to answer questions and to explain the Settlement Agreement. The parties acknowledge that personal safety and institutional security are major interests of Defendant, and the parties therefore agree that Defendant and his agents shall have the right to limit the number of inmates that may meet at one time with counsel, and may take such other security precautions as are reasonable under the circumstances. Consistent with reasonable security needs, Defendant will make a good faith effort to provide an opportunity for counsel to meet with all inmates, or representatives of inmates, who wish to meet with counsel. The parties agree that reasonable notice pursuant to Rule 23(e) does not require that every inmate who wishes to meet personally or in a group with counsel for Plaintiffs be allowed to meet with counsel.

S. This Settlement Agreement may be modified in the future by mutual and joint agreement of the parties, or their successors, upon joint petition to the Court and approval by the Court after notice and hearing, by an Order amending the Consent Order and Judgment.

## V.

### ADMINISTRATIVE AND OPERATIONAL GOALS

Throughout the course of this litigation Plaintiffs have expressed concern with regard to several issues not specifically addressed in the terms of the Settlement Agreement section above. Defendant has not reached agreement with Plaintiffs as to these specific issues, and does not intend this section to form any enforceable portion of this Settlement Agreement or any recognition of constitutional standards. Nevertheless Defendant frequently has agreed with Plaintiffs as to resolution of these issues as management aspirations and goals. Defendant therefore wishes in this section to set forth those areas with which he agrees with Plaintiffs in principle, as important management goals, and to state those

aspirational goals which he will strive to achieve.

Plaintiffs have been concerned in this litigation with the assignment of two inmates to a room which houses one inmate at Design Capacity. Plaintiffs and Defendants both realize that Defendant's administrative and operational goal is to operate the entire prison system in the future at Design Capacity. At Design Capacity most rooms would house one inmate and there would be no double-bunking in dormitories. Defendant continues to believe that achievement of operation at Design Capacity is a major administrative goal. While this goal is not to be an enforceable term of this Settlement Agreement or recognition of a constitutional standard, it will be a goal that Defendant will continue vigorously to pursue.

Pursuant to paragraph IV–C Plaintiffs have agreed as a term of this Settlement Agreement that Defendant may operate individual institutions at levels up to Maximum Capacity, as long as System Maximum Capacity is not exceeded. Plaintiffs have, however, expressed concern that Defendant may allow one or two institutions to operate at Maximum Capacity on a long term basis. While further restriction upon the operation of a single institution is not intended to be an enforceable term of this Settlement Agreement, it is Defendant's administrative goal that inmates be assigned to the least restrictive institutional environment consistent with inmate behavior, rehabilitative progress, and security requirements, and that community correctional facilities, and the like, be operated at levels closer to Maximum Capacity than more restrictive and secure institutions.

Plaintiffs have also been concerned that adequate dayroom space be provided so that inmates have living space other than space allocated solely for sleeping. Defendant recognizes that Plaintiffs have relied in part upon the current availability of dayroom facilities in reaching this Settlement Agreement. While objective criteria or specific standards for dayroom space are

not agreed upon herein and are not enforceable terms of this Settlement Agreement, Defendant promises to continue to plan for and attempt to provide dayroom space as a management goal. Defendant recognizes that inmates need recreational and social spaces during the evening hours when more closely confined to dormitory buildings, and that dayrooms serve this important purpose. Since 1975 Defendant has sought and obtained funding to improve the dayrooms at Apalachee Correctional Institution and Glades Correctional Institution. Defendant will continue to seek similar funding, and will include dayroom space in proposed plans for future institutions.

Defendant finally acknowledges that Plaintiffs have been interested in improved custodial staffing so as to improve security and inmate safety. Defendant recognizes that Plaintiffs have in part relied upon current security staffing as depicted in Defendant's Exhibits C and D in Evidence (June 7, 1979) in reaching this Settlement Agreement. While specific standards for security staffing are not enforceable terms of this Settlement Agreement, Defendant agrees that reasonable management of a correctional system requires adequate security staff to provide safety and care for inmates. Defendant therefore agrees that as a reasonable management goal, he will strive in good faith to maintain and improve the levels of security staffing as currently exist at major institutions.

## VI.

### ALL PROMISES AND TERMS CONTAINED WITHIN THIS SETTLEMENT AGREEMENT

This Settlement Agreement contains the entire agreement between the parties and neither party has made any additional promises to induce the other party to enter into this Settlement Agreement, or to consent to entry of the Consent Order and Judgment, or to vary the terms of this Agreement in any manner.

NOW THEREFORE, in mutual consideration of all of the foregoing promises and covenants, the parties enter into this Settlement Agreement this 23 day of October, 1979.

FOR THE PLAINTIFFS

s/ Tobias Simon

TOBIAS SIMON
Counsel for Plaintiffs
1492 South Miami Avenue
Miami, Florida 33130

DEFENDANT

s/ L. L. Wainwright

LOUIE L. WAINWRIGHT ·
Secretary of the Department
of Corrections
1311 Winewood Boulevard
Tallahassee, Florida 32301

FOR THE DEFENDANT
JIM SMITH
Attorney General

s/ William C. Sherrill, Jr.,

WILLIAM C. SHERRILL, JR.
Special Assistant Attorney General
Department of Legal Affairs
The Capitol
Tallahassee, Florida 32301

s/ Sydney H. McKenzie

SYDNEY H. McKENZIE, III
Chief Trial Counsel
Department of Legal Affairs
The Capitol
Tallahassee, Florida 32301

### APPROVAL AND SUPPORT

I, BOB GRAHAM, as Governor of the State of Florida, support the foregoing Settlement Agreement and will, to the best of my ability, exercise my constitutional authority and leadership committed to me by the people of the State of Florida to seek to implement the terms thereof.

10.22.79

DATE

s/ Bob Graham

BOB GRAHAM
Governor, State of Florida
The Capitol
Tallahassee, Florida 32301