# LYNCE *v.* MATHIS, SUPERINTENDENT, TOMOKA CORRECTIONAL INSTITUTION, ET AL.

No. 95–7452.   Argued November 4, 1996—Decided February 19, 1997

*Joel T. Remland* argued the cause for petitioner. With him on the briefs was *Carter G. Phillips.*

*Parker D. Thomson,* Assistant Attorney General of Florida, argued the cause for respondents. On the brief for respondent Butterworth were *Mr. Butterworth,* Attorney

General, *pro se,* and *Jason Vail,* Assistant Attorney General. *Susan A. Maher* filed a brief for respondent Mathis.*

JUSTICE STEVENS delivered the opinion of the Court.

In 1983 and thereafter the Florida Legislature enacted a series of statutes authorizing the department of corrections to award early release credits to prison inmates when the population of the state prison system exceeded predetermined levels. The question presented by this case is whether a 1992 statute canceling such credits for certain classes of offenders after they had been awarded—indeed, after they had resulted in the prisoners' release from custody—violates the *Ex Post Facto* Clause of the Federal Constitution.

I

In 1986 petitioner pleaded *nolo contendere* to a charge of attempted murder and received a sentence of 22 years (8,030 days) in prison. In 1992 the Florida Department of Corrections released him from prison based on its determination that he had accumulated five different types of early release credits totaling 5,668 days.[1] Of that total, 1,860 days were

---

*Chet Kaufman* filed a brief for the Florida Public Defender Association, Inc., as *amicus curiae* urging reversal.

A brief of *amici curiae* urging affirmance was filed for the State of Nevada et al. by *Frankie Sue Del Papa,* Attorney General of Nevada, and *Anne B. Cathcart,* Senior Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Daniel E. Lungren* of California, *Michael J. Bowers* of Georgia, *Alan G. Lance* of Idaho, *Carla J. Stovall* of Kansas, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Jeffrey B. Pine* of Rhode Island, *Charles Molony Condon* of South Carolina, *Jeffrey L. Amestoy* of Vermont, and *James S. Gilmore III* of Virginia.

*Lisa B. Kemler* and *Baya Harrison III* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae.*

[1] The total included: (1) a 170-day credit for time spent in jail prior to his conviction; (2) "basic gain-time" of 2,640 days; (3) "additional [incentive]

"provisional credits" awarded as a result of prison over-crowding. Shortly after petitioner's release, the state attorney general issued an opinion interpreting a 1992 statute as having retroactively canceled all provisional credits awarded to inmates convicted of murder or attempted murder. Petitioner was therefore rearrested and returned to custody. His new release date was set for May 19, 1998.

In 1994 petitioner filed a petition for a writ of habeas corpus alleging that the retroactive cancellation of provisional credits violated the *Ex Post Facto* Clause. Relying on Eleventh Circuit[2] and Florida[3] precedent holding that the revocation of provisional credits did not violate the *Ex Post Facto* Clause because their sole purpose was to alleviate prison overcrowding, the Magistrate Judge recommended dismissal of the petition. The District Court adopted that recommendation, dismissed the petition, and denied a certificate of probable cause. The Court of Appeals for the Eleventh Circuit also denied a certificate of probable cause in an unpublished order. Because the Court of Appeals for the Tenth Circuit reached a different conclusion on similar facts, *Arnold* v. *Cody*, 951 F. 2d 280 (1991), we granted certiorari to resolve the conflict. 517 U. S. 1186 (1996).[4]

---

gain-time" of 958 days; (4) "administrative gain-time" of 335 days; and (5) "provisional credits" of 1,860 days. Disciplinary action resulted in a forfeiture of 295 days.

[2] *Hock* v. *Singletary*, 41 F. 3d 1470 (1995).

[3] *Dugger* v. *Rodrick*, 584 So. 2d 2 (Fla. 1991), cert. denied *sub nom. Rodrick* v. *Singletary*, 502 U. S. 1037 (1992).

[4] Petitioner did not advance his *ex post facto* claim in state court. In the District Court respondents challenged his failure to exhaust his state remedies, but do not appear to have raised the exhaustion issue in the Court of Appeals; nor have they raised it in this Court. Presumably they are satisfied, as we are, that exhaustion would have been futile. The Florida Supreme Court, in *Dugger* v. *Rodrick*, 584 So. 2d 2 (1991), held that retrospective application of the provisional credits statute's offense-based exclusion did not violate the *Ex Post Facto* Clause. The court reasoned that overcrowding credits, unlike basic gain-time or incentive gain-time, were merely "procedural" and did not create any substantive

## II

Motivated largely by the overcrowded condition of the entire Florida prison system,[5] in 1983 the state legislature enacted the Correctional Reform Act of 1983, a comprehensive revision of the State's sentencing laws.[6] The Act authorized generous awards of early release credits including "basic gain-time" at the rate of 10 days for each month, "up to 20 days of incentive gain time, which shall be credited and applied monthly," and additional deductions of "meritorious gain-time of from 1 to 60 days." See 1983 Fla. Laws, ch. 83–131, § 8.[7] The Act also created an emergency procedure to be followed "whenever the population of the state correctional system exceeds 98 percent of the lawful capacity of the system for males or females, or both." § 5(1).[8] When

---

rights. Relying on *Dugger*, the Florida Supreme Court held in *Griffin* v. *Singletary*, 638 So. 2d 500 (1994), that cancellation of provisional credits actually awarded to a prisoner did not violate the *Ex Post Facto* Clause. Respondents have not suggested any reason why the Florida courts would have decided petitioner's case differently.

[5] In 1980 the Florida Department of Corrections consented to the entry of a decree establishing a limit on the prison population that could not be exceeded without court approval. See *Costello* v. *Wainwright*, 489 F. Supp. 1100 (MD Fla. 1980). In 1982 a special session of the legislature created a Corrections Overcrowding Task Force, which drafted the 1983 legislation.

[6] 1983 Fla. Laws, ch. 83–131.

[7] Section 8 amended § 944.275 of the Florida Statutes.

[8] Section 5, in pertinent part, provides:

"(1) The Department of Corrections shall advise the Governor of the existence of a state of emergency in the state correctional system whenever the population of the state correctional system exceeds 98 percent of the lawful capacity of the system for males or females, or both. In conveying this information, the secretary of the department shall certify the rated design capacity, maximum capacity, lawful capacity, system maximum capacity, and current population of the state correctional system. When the Governor verifies such certification by letter, the secretary shall declare a state of emergency.

"(2) Following the declaration of a state of emergency, the sentences of all inmates in the system who are eligible to earn gain-time shall be re-

such an emergency was declared, "the sentences of all inmates in the system who are eligible to earn gain-time shall be reduced by the credit of up to 30 days gain-time in 5-day increments as may be necessary to reduce the inmate population to 97 percent of lawful capacity." § 5(2).

In the ensuing years, the Florida Legislature modified the overcrowding gain-time system. In 1987 the legislature raised the threshold for awarding emergency release credits from 98% to 99% of capacity. At the same time, the legislature authorized a new form of overcrowding credit, administrative gain-time, with a 98% threshold, which authorized up to a maximum of 60 days additional gain-time to inmates already earning incentive gain-time. Inmates serving sentences for certain offenses were ineligible for the awards. In 1988 the legislature repealed the administrative gain-time provision, and replaced it with a provisional credits system.[9] The language of the provisional credits statute was virtually identical to that of the administrative gain-time statute—it also authorized up to 60 days of gain-time but was triggered when the inmate population reached 97.5% of capacity. In addition, the legislature expanded the list of offenders who were ineligible for the awards.

Having received overcrowding gain-time under the administrative gain-time and provisional credits statutes, as well as basic and incentive gain-time, petitioner was released from prison in 1992. That same year, the legislature canceled provisional overcrowding credits for certain classes of

duced by the credit of up to 30 days gain-time in 5-day increments as may be necessary to reduce the inmate population to 97 percent of lawful capacity." 1983 Fla. Laws, ch. 83–131, § 5.

[9] 1988 Fla. Laws, ch. 88–122, § 5. The provisional credits statute was repealed in 1993. 1993 Fla. Laws, ch. 93–406, §§ 32, 35. The only overcrowding credit system in place today in Florida is the "control release" provision, first enacted in 1989, which authorizes release from incarceration rather than gain-time to control prison population. See Fla. Stat. § 947.146 (Supp. 1992).

inmates, including those convicted of attempted murder.[10] As a result of that action, credits for 2,789 inmates who were still in custody were canceled, and rearrest warrants were issued for 164 offenders who had been released.[11] Petitioner was in the latter class.

Respondents contend that the cancellation of petitioner's provisional credits did not violate the *Ex Post Facto* Clause for two reasons: (1) Because the credits had been issued as part of administrative procedures designed to alleviate overcrowding, they were not an integral part of petitioner's punishment; and (2) in petitioner's case, the specific overcrowding credits had been awarded pursuant to statutes enacted after the date of his offense rather than pursuant to the 1983 statute. We consider the arguments separately.

## III

The presumption against the retroactive application of new laws is an essential thread in the mantle of protection that the law affords the individual citizen. That presumption "is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf* v. *USI Film Products*, 511 U. S. 244, 265 (1994). This doctrine finds expression in several provisions of our Consti-

---

[10] See Fla. Op. Atty. Gen. 92–96 (1992), reprinted in Lodging, p. 53; *Griffin* v. *Singletary*, 638 So. 2d, at 501. In 1989 the Florida Legislature amended the provisional credits statute to render those convicted of certain murder offenses, including attempted murder, ineligible for provisional credits. Fla. Stat. § 944.277 (1989). The Florida Department of Corrections interpreted the 1989 amendments, and subsequent amendments enacted in 1990 and 1991 which contained the same exclusion, to apply prospectively. The 1992 amendment at issue in this case was originally interpreted by the department of corrections to apply only prospectively, but the subsequent 1992 opinion by the attorney general concluded that the statute applied retroactively.

[11] Department of Corrections Letter of July 9, 1996, App. to Brief for Florida Public Defender Association, Inc., as *Amicus Curiae*. The petitioner's administrative gain-time credits were also canceled, but he does not challenge that action.

tution.[12]   The specific prohibition on *ex post facto* laws is only one aspect of the broader constitutional protection against arbitrary changes in the law.   In both the civil and the criminal context, the Constitution places limits on the sovereign's ability to use its lawmaking power to modify bargains it has made with its subjects.   The basic principle is one that protects not only the rich and the powerful, *United States* v. *Winstar Corp.*, 518 U. S. 839 (1996), but also the indigent defendant engaged in negotiations that may lead to an acknowledgment of guilt and a suitable punishment.

Article I, § 10, of the Federal Constitution provides that "[n]o State shall . . . pass any . . . ex post facto Law."   In his opinion for the Court in *Beazell* v. *Ohio*, 269 U. S. 167 (1925), Justice Stone explained:

> "The constitutional prohibition and the judicial interpretation of it rest upon the notion that laws, whatever their form, which purport to make innocent acts criminal after the event, or to aggravate an offense, are harsh and oppressive, and that the criminal quality attributable to an act, either by the legal definition of the offense or by the nature or amount of the punishment imposed for its commission, should not be altered by legislative enactment, after the fact, to the disadvantage of the accused."   *Id.*, at 170.

---

[12] "The *Ex Post Facto* Clause flatly prohibits retroactive application of penal legislation.   Article I, § 10, cl. 1, prohibits States from passing another type of retroactive legislation, laws 'impairing the Obligation of Contracts.'   The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a 'public use' and upon payment of 'just compensation.'   The prohibitions on 'Bills of Attainder' in Art. I, §§ 9–10, prohibit legislatures from singling out disfavored persons and meting out summary punishment for past conduct.   See, *e. g.*, *United States* v. *Brown*, 381 U. S. 437, 456–462 (1965).   The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation . . . ."   *Landgraf* v. *USI Film Products*, 511 U. S., at 266 (footnote omitted).

The bulk of our *ex post facto* jurisprudence has involved claims that a law has inflicted "a greater punishment, than the law annexed to the crime, when committed." *Calder* v. *Bull*, 3 Dall. 386, 390 (1798) (emphasis deleted).[13] We have explained that such laws implicate the central concerns of the *Ex Post Facto* Clause: "the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver* v. *Graham*, 450 U. S. 24, 30 (1981).

To fall within the *ex post facto* prohibition, a law must be retrospective—that is, "it must apply to events occurring before its enactment"—and it "must disadvantage the offender affected by it," *id.*, at 29, by altering the definition of criminal conduct or increasing the punishment for the crime, see *Collins* v. *Youngblood*, 497 U. S. 37, 50 (1990). In this case the operation of the 1992 statute to effect the cancellation of overcrowding credits and the consequent reincarceration of petitioner was clearly retrospective. The narrow issue that we must decide is thus whether those consequences disadvantaged petitioner by increasing his punishment.

In arguing that the cancellation of overcrowding credits inflicts greater punishment, petitioner relies primarily on our decision in *Weaver* v. *Graham*, in which we considered whether retroactively decreasing the amount of gain-time awarded for an inmate's good behavior violated the *Ex Post Facto* Clause. In that case the petitioner had pleaded guilty

---

[13] This case falls in the third of the four categories of *ex post facto* laws described by Justice Chase: "1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." *Calder* v. *Bull*, 3 Dall., at 390 (emphasis deleted).

to second-degree murder and had been sentenced to prison for 15 years. At the time of Weaver's plea, Florida law provided credits contingent on the good conduct of the prisoner of 5 days per month for the first two years of his sentence, 10 days per month for the third and fourth years, and 15 days per month thereafter. The law therefore provided him with an opportunity to be released after serving less than nine years of his sentence. In 1978 the Florida Legislature enacted a new formula for computing gain-time; instead of 5, 10, and 15 days per month, it authorized only 3, 6, and 9 days. The new statute did not withdraw any credits already awarded to Weaver, but by curtailing the availability of future credits it effectively postponed the date when he would become eligible for early release. Because the statute made the punishment for crimes committed before its enactment "more onerous," we unanimously concluded that it ran "afoul of the prohibition against *ex post facto* laws." 450 U. S., at 36.

According to petitioner, although this case involves overcrowding credits, it is essentially like *Weaver* because the issuance of these credits was dependent on an inmate's good conduct. Respondents, on the other hand, submit that *Weaver* is not controlling because it was the overcrowded condition of the prison system, rather than the character of the prisoner's conduct, that gave rise to the award. In our view, both of these submissions place undue emphasis on the legislature's subjective intent in granting the credits rather than on the consequences of their revocation.

In arriving at our holding in *Weaver*, we relied not on the subjective motivation of the legislature in enacting the gain-time credits, but rather on whether objectively the new statute "lengthen[ed] the period that someone in petitioner's position must spend in prison." *Id.*, at 33. Similarly, in this case, the fact that the generous gain-time provisions in Florida's 1983 statute were motivated more by the interest in avoiding overcrowding than by a desire to reward good behavior is not relevant to the essential inquiry demanded by

the *Ex Post Facto* Clause: whether the cancellation of 1,860 days of accumulated provisional credits had the effect of lengthening petitioner's period of incarceration.

In our post-*Weaver* cases, we have also considered whether the legislature's action lengthened the sentence without examining the purposes behind the original sentencing scheme. In *Miller* v. *Florida*, 482 U. S. 423 (1987), we unanimously concluded that a revision in Florida's sentencing guidelines that went into effect between the date of petitioner's offense and the date of his conviction violated the *Ex Post Facto* Clause. Our determination that the new guideline was "'more onerous than the prior law,'" *id.*, at 431 (quoting *Dobbert* v. *Florida*, 432 U. S. 282, 294 (1977)), rested entirely on an objective appraisal of the impact of the change on the length of the offender's presumptive sentence. 482 U. S., at 431 ("Looking only at the change in primary offense points, the revised guidelines law clearly disadvantages petitioner and similarly situated defendants").

In *California Dept. of Corrections* v. *Morales*, 514 U. S. 499 (1995), we also relied entirely on objective considerations to support our conclusion that an amendment to California's parole procedures that decreased the frequency of parole hearings for certain offenders had not made any "change in the 'quantum of punishment,'" *id.*, at 508. The amendment at issue in *Morales* allowed the parole board, after holding an initial parole hearing, to defer for up to three years subsequent parole suitability hearings for prisoners convicted of multiple murders if the board found that it was unreasonable to expect that parole would be granted at a hearing during the subsequent years. We stated that the relevant inquiry is whether the "change alters the definition of criminal conduct or increases the penalty by which a crime is punishable." *Id.*, at 507, n. 3.[14] After making that inquiry, we

---

[14] Later in the opinion we restated the test in similar language: "In evaluating the constitutionality of the 1981 amendment, we must determine whether it produces a sufficient risk of increasing the measure of punish-

found that "there is no reason to conclude that the amendment will have any effect on any prisoner's actual term of confinement." *Id.*, at 512. Our holding rested squarely on the conclusion that "a prisoner's ultimate date of release would be entirely unaffected by the change in the timing of suitability hearings." *Id.*, at 513. Although we held that "speculative and attenuated possibilit[ies]" of increasing the measure of punishment do not implicate the *Ex Post Facto* Clause, *id.*, at 509, the bulk of our analysis focused on the effect of the law on the inmate's sentence.

We did not imply in *Morales*, as respondents contend, that the constitutionality of retroactive changes in the quantum of punishment depended on the purpose behind the parole sentencing system. The only mention of legislative purpose in *Morales* was in the following passage:

> "In contrast to the laws at issue in *Lindsey* [v. *Washington*, 301 U. S. 397 (1937)], *Weaver*, and *Miller* (which had the purpose and effect of enhancing the range of available prison terms, see *Miller, supra*, at 433–434), the evident focus of the California amendment was merely ' " 'to relieve the [Board] from the costly and time-consuming responsibility of scheduling parole hearings' " ' for prisoners who have no reasonable chance of being released. *In re Jackson*, 39 Cal. 3d 464, 473, 703 P. 2d 100, 106 (1985) (quoting legislative history)." *Id.*, at 507.

Thus, we concluded, the change at issue had neither the purpose nor the effect of increasing the quantum of punishment. Whether such a purpose alone would be a sufficient basis for concluding that a law violated the *Ex Post Facto* Clause when it actually had no such effect is a question the Court has never addressed. Moreover, in *Morales* our statements regarding purpose did not refer to the purpose behind the

---

ment attached to the covered crimes." *California Dept. of Corrections v. Morales*, 514 U. S., at 509.

creation of the original sentencing scheme; they referred instead to the question whether, in changing that sentencing scheme, the legislature intended to lengthen the inmate's sentence. To the extent that any purpose might be relevant in this case, it would only be the purpose behind the legislature's 1992 enactment of the offense-based exclusion. Here, unlike in *Morales*, there is no evidence that the legislature's change in the sentencing scheme was merely to save time or money. Rather, it is quite obvious that the retrospective change was intended to prevent the early release of prisoners convicted of murder-related offenses who had accumulated overcrowding credits.[15]

Respondents also argue that the retroactive cancellation of overcrowding credits is permissible because overcrowding gain-time—unlike the incentive gain-time at issue in *Weaver* which is used to encourage good prison behavior and prisoner rehabilitation—"b[ears] no relationship to the original penalty assigned the crime or the actual penalty calculated under the sentencing guidelines." Brief for Respondent Mathis 20. To the extent that respondents' argument rests on the notion that overcrowding gain-time is not "in some technical sense part of the sentence," *Weaver*, 450 U. S., at 32, this argument is foreclosed by our precedents. As we recognized in *Weaver*, retroactive alteration of parole or early release provisions, like the retroactive application of provisions that govern initial sentencing, implicates the *Ex Post Facto* Clause because such credits are "one determinant of petitioner's prison term . . . and . . . [the petitioner's] effective sentence is altered once this determinant is changed." *Ibid.* We explained in *Weaver* that the removal of such provisions can constitute an increase in punishment, because a "prisoner's eligibility for reduced imprisonment is a signifi-

---

[15] Indeed, the attorney general issued the 1992 opinion interpreting the statute to apply retroactively in response to concerns about the release of a notorious sex offender and murderer. See Fla. Op. Atty. Gen. 92–96, at 283, reprinted in Lodging, at 53.

cant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed." *Ibid.*

Respondents argue that this reasoning does not apply to overcrowding credits because, when petitioner pleaded *nolo contendere,* he could not reasonably have expected to receive any such credits. The State, after all, could have alleviated the overcrowding problem in various ways: It could have built more prisons; it could have paroled a large category of nonviolent offenders; or it might have discontinued prosecution of some classes of victimless crimes. Respondents thus argue that the 1992 statute does not violate the *Ex Post Facto* Clause because, like the California amendment at issue in *Morales,* it "create[d] only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes." 514 U. S., at 509.[16] Given the fact that this petitioner was actually awarded 1,860 days of provisional credits and the fact that those credits were retroactively canceled as a result of the 1992 amendment, we find this argument singularly unpersuasive. In this case, unlike in *Morales,* the actual course of events makes it unnecessary to speculate about what might have happened. The 1992 statute has unques-

---

[16] The support for our conclusion in *Morales* that the Act was merely speculative has no counterpart in this case. In *Morales,* we first relied on the fact that the amendment affected a class of prisoners—multiple murderers—who had little chance of being released on parole. Second, we found that the amendment did not alter the date of the prisoner's initial parole suitability hearing, and therefore only affected those initially deemed unsuitable for parole. Lastly, we recognized that the parole board "retain[ed] the authority to tailor the frequency of subsequent suitability hearings to the particular circumstances of the individual prisoner." 514 U. S., at 511. Simply put, we rejected the inmate's claim in *Morales,* because it could not be said with any certainty that the amended statutory scheme was more "onerous" than at the time of the crime. See *id.,* at 509–510 (quoting *Dobbert* v. *Florida,* 432 U. S. 282, 294 (1977), for "refusing to accept 'speculation' that the effective punishment under a new statutory scheme would be 'more onerous' than under the old one").

tionably disadvantaged petitioner because it resulted in his rearrest and prolonged his imprisonment. Unlike the California amendment at issue in *Morales*, the 1992 Florida statute did more than simply remove a mechanism that created an *opportunity* for early release for a class of prisoners whose release was unlikely; rather, it made ineligible for early release a class of prisoners who were previously eligible—including some, like petitioner, who had actually been released.[17]

## IV

Although it does not appear that respondents advanced this argument in the papers filed in the District Court, the Court of Appeals, or in their brief in opposition to the petition for certiorari in this Court, they now argue that petitioner is not entitled to relief because his overcrowding credits were awarded pursuant to statutes enacted after the date of his offense rather than pursuant to the 1983 statute. We disagree.

The overcrowding statute in effect at the time of petitioner's crime was modified in subsequent years, but its basic elements remained the same: The statute provided for reductions in a prisoner's sentence when the population of the prison system exceeded a certain percentage of lawful capacity. At the time of petitioner's sentence in 1986, the emergency gain-time statute was in effect. Under that statute, when the prison population reached 98% of lawful capacity,

---

[17] We note that respondents do not argue, as the Magistrate Judge found, that the revocation of overcrowding credits is constitutional because such an act is merely "procedural." There is no merit to this argument in any case. We explained in *Dobbert* v. *Florida,* 432 U. S. 282 (1977), that a procedural statute is one that "simply alter[s] the methods employed in determining" whether the punishment is "to be imposed" rather than "chang[ing] . . . the quantum of punishment attached to the crime." *Id.,* at 293–294. Because the 1992 law did not change the method of determining the sentence, but rather lengthened the sentences of certain prisoners by making them ineligible for early release, it was not merely procedural.

the secretary of the department of corrections was required to advise the Governor and, after receiving the Governor's verification of the capacity certification, to declare a state of emergency whereupon the sentences of all eligible inmates "shall be reduced by the credit of up to 30 days gain-time, in 5-day increments, as may be necessary to reduce the inmate population to 97 percent of lawful capacity." Fla. Stat. § 944.598(2) (1983).[18]

The later statutes slightly modified the procedures outlined in the 1983 statute. The administrative gain-time statute enacted in 1987 (after petitioner's plea of *nolo contendere*) provided that the secretary, after certification to the Governor, "may grant up to a maximum of 60 days administrative gain-time." Fla. Stat § 944.276(1). Unlike the emergency gain-time statute, the administrative gain-time statute made the issuance of gain-time discretionary, and it contained certain offense-based exclusions. The provisional credits provision was enacted to replace administrative gain-time and is essentially the same, except that it provides for the issuance of gain-time when the prison reaches

---

[18] Respondent Attorney General Butterworth suggests that under the emergency gain-time statute, the maximum award petitioner could have realized was 30 days of emergency gain-time. Therefore, according to the attorney general, it is unlikely that the gain-time statute would have had any effect on petitioner's sentence. We do not agree that the statute lends itself to such a reading. The statute required the department of corrections to advise the Governor "*whenever* the population of the state correctional system exceeds 98 percent of lawful capacity." Fla. Stat. § 944.598(1) (1983) (emphasis added). The duty to grant up to 30 days gain-time in 5-day increments was continuing until the inmate population reached 97% of lawful capacity. If the inmate population were to rise again to 98%, the Secretary was required to issue additional gain-time.

Moreover, the attorney general's reading of the emergency gain-time statute would also limit the award of gain-time under the administrative gain-time and provisional credits statute. These statutes contain wording similar to the emergency gain-time statute, see Fla. Stat. § 944.276(1) (1987); Fla. Stat. § 944.277(1) (1989), yet the State has not interpreted the statutes to limit the award of gain-time to a total of 60 days.

97.5% of lawful capacity, rather than 98%. Fla. Stat. § 944.277 (1988). See *Griffin* v. *Singletary,* 638 So. 2d 500 (Fla. 1994).

The changes in the series of statutes authorizing the award of overcrowding gain-time do not affect petitioner's core *ex post facto* claim. Petitioner could have accumulated gain-time under the emergency gain-time provision in much the same manner as he did under the provisional credits statute. We recognize, however, that although the differences in the statutes did not affect petitioner's central entitlement to gain-time, they may have affected the precise amount of gain-time he received. Between 1988 and 1992, the provisional credits were authorized when the prison reached 97.5% capacity rather than 98% capacity as under the emergency gain-time statute. If the prison population did not exceed 98% of capacity between 1988 and 1992, and if petitioner received provisional credits during those years, there is force to the argument that the cancellation of that portion of the 1,860-day total did not violate the *Ex Post Facto* Clause. Because this point was not adequately developed earlier in the proceeding, and because it may not in any event affect petitioner's entitlement to release, we leave it open for further consideration on remand.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, concurring in part and concurring in the judgment.

I understand the Court's opinion to hold that retroactively canceling petitioner's so-called "provisional credits" after he has used them to gain his freedom violates the *Ex Post Facto* Clause. This result naturally follows from our consistent view that the Clause is intended to prohibit laws that "retroactively alter the definition of crimes or increase the punish-

ment for criminal acts." *Collins* v. *Youngblood*, 497 U. S. 37, 43 (1990).

Whether a particular law retroactively increases a criminal punishment is often a close question. In *California Dept. of Corrections* v. *Morales*, 514 U. S. 499 (1995), for example, respondent challenged a retroactive change to the frequency of parole hearings. Given that the retroactive change "create[d] only the most speculative and attenuated risk of increasing the measure of punishment attached to the covered crimes," we found no *ex post facto* violation. *Id.*, at 514.

Unlike in *Morales*, the increase in petitioner's punishment here was neither "speculative" nor "attenuated." Petitioner pleaded *nolo contendere* to a charge of attempted murder and was duly sentenced. During the period of his confinement, petitioner accumulated release credits under a state statute adopted in response to prison overcrowding. Those credits enabled petitioner to be freed from prison before his sentence (as originally imposed) had run. Shortly before petitioner secured his release, however, the Florida Legislature enacted a statute preventing certain categories of offenders from taking advantage of the provisional credits. Although petitioner's offense placed him among the offenders denied the opportunity to acquire those particular credits, the statute was not applied retroactively. Petitioner was thus released. The state attorney general subsequently issued an opinion giving the statute retroactive effect. The State thereafter rearrested petitioner and returned him to custody.

Under these narrow circumstances, I agree with the Court that the State's retroactive nullification of petitioner's previously accrued, and then used, release credits violates the Constitution's ban on *ex post facto* lawmaking. I do not, however, join the majority's discussion of *Weaver* v. *Graham*, 450 U. S. 24 (1981), which I find unnecessary to the resolution of this case. In *Weaver*, we considered whether a statute

that merely altered the availability of "good conduct" credits ran afoul of the *Ex Post Facto* Clause. *Id.*, at 25. The present case involves not merely an effect on the availability of *future* release credits, but the retroactive elimination of credits already earned and used. Accordingly, I concur in part and concur in the judgment.