USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1246 UNITED STATES, Appellee, v. JUAN SANTIAGO-GONZALEZ, Defendant - Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Carmen Consuelo Cerezo, U.S. District Judge] ___________________ ____________________ Before Cyr, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and McAuliffe,* District Judge. ______________ _____________________ Luis F. Abreu-El as on brief for appellant. ___________________ Guillermo Gil, United States Attorney, Jos A. Quiles- ______________ _________________ Espinosa, Senior Litigation Counsel and Miguel A. Pereira, ________ ___________________ Assistant United States Attorney, on brief for appellee. ____________________ September 25, 1995 ____________________  ____________________ * Of the District of New Hampshire, sitting by designation. McAULIFFE, District Judge. Juan Santiago-Gonz lez McAULIFFE, District Judge. _______________ ("defendant") appeals from the district court's refusal to enforce a term of his written plea agreement ("Agreement") which ostensibly required the government to file a motion for downward departure under 5K1.1 of the United States Sentencing Guidelines. He also questions the district court's calculation of his base offense level under the Guidelines. For the reasons set forth below, we affirm. I. BACKGROUND I. BACKGROUND __________ On July 2, 1992, defendant and three others were indicted on four counts of defrauding the Corporaci n Insular de Seguros ("CIS") of $1,401,000.00. CIS, a privately held insurance company chartered in the Commonwealth of Puerto Rico, was controlled by the defendant and two of three co-defendants. Defendant was employed as CIS's vice president for claims. Two of his co-defendants served as CIS's president and vice president for finance and operations, respectively, and the third, an attorney, was engaged in private practice. The three corporate officers were effectively able to manage the company's assets and authorize payment of claims made against its policies. From October of 1991 until May of 1992, defendant and his colleagues jointly ran a false insurance claim scheme. Defendant, as vice president for claims, reopened previously closed claim files so fictitious claims could be made against those accounts. The vice president for finance established and assigned cash reserves to those reopened accounts. The attorney -2- then submitted fictitious claims on behalf of non-existent clients, which were paid by CIS and charged against the reserves assigned to the reopened accounts. The false claims were paid by checks drawn on CIS's bank account and made payable to the attorney, as counsel for the fictitious claimants. The attorney cashed the checks, kept part of the proceeds for himself, and distributed the remainder among the three CIS officers, usually in equal shares. Defendant's collaborators pled guilty soon after they were charged, but defendant entered a not guilty plea and stood trial. Two days into his trial, defendant reconsidered and accepted a plea bargain. In exchange for defendant's plea of guilty, the government agreed to exercise its discretion to file a motion for downward departure under U.S.S.G. 5K1.1, contingent on defendant's anticipated "completely truthful, forthright, and honest assistance and information." Additionally, the plea agreement required defendant to submit to a polygraph examination "should the United States deem it appropriate." After executing the Agreement, defendant dutifully entered pleas of guilty to mail fraud and aiding and abetting. 18 U.S.C. 1341; 18 U.S.C. 2. In late April 1993, the government deemed it appropriate for defendant to submit to a polygraph examination in order to resolve some doubt about whether he was being entirely truthful and cooperative in the ongoing investigation. Defendant submitted to the polygraph and, in the opinion of the examiner, -3- the test results indicated deception. Accordingly, at sentencing the government refused to move for a downward departure under U.S.S.G. 5K1.1. In addition, the district court, relying on the testimony of his accomplices, found that defendant was not a minor participant in the scheme, as he claimed. Instead of adjusting his offense level downward as defendant had hoped, the trial judge upwardly adjusted his base offense level, relying on U.S.S.G. 2F1.1(2) (more than minimal planning) and U.S.S.G.  3B1.3 (abuse of position of trust). II. DISCUSSION II. DISCUSSION __________ On appeal, defendant raises two issues. First, he challenges the district court's refusal to enforce the government's obligation to move for downward departure under 5K1.1. Next, he questions the district court's calculation of his base offense level under the Guidelines. A. Denial of Specific Performance of the Plea A. Denial of Specific Performance of the Plea Agreement Agreement Defendant says that by meeting with the prosecution, providing truthful information, and submitting to the requested polygraph examination, he substantially performed his obligations under the Agreement, thereby earning the departure motion. He argues that the government's obligation to file a 5K1.1 motion was contingent only upon his providing "truthful information," which, in substance, he did. The Agreement provides that "if in the opinion of the [polygraph] examiner your answers indicate deception you will be -4- in breach of this agreement." Defendant concedes that the polygraph examiner was of the opinion that his answers indicated deception, and he does not seriously dispute that in fact he did not answer all questions truthfully. But, he says, successfully passing a polygraph examination was not a condition precedent to the government's obligation to move for downward departure; it was simply an additional undertaking intended to provide the government with some means of gauging the extent of his "truthful cooperation" (which was the condition precedent). His failure to ___ answer every question truthfully during the polygraph examination may have frustrated the government's desire for "corroboration," and the absence of corroboration may have devalued his "truthful cooperation" by some degree, he argues, but he nevertheless substantially "truthfully cooperated." He reasons that he at least earned the departure motion, and says that it is the extent ______ of the departure that should reflect his less than perfect performance. We have held that plea agreements "must be attended by safeguards to insure the defendant what is reasonably due in the circumstances." United States v. Baldacchino, 762 F.2d 170, 179 _____________ ___________ (1st Cir. 1985) (citing Santobello v. New York, 404 U.S. 257 __________ _________ (1971)). We have also recognized that principles of contract law often provide useful references when construing plea agreements. See United States v. Anderson, 921 F.2d 335, 337 (1st Cir. 1990) ___ _____________ ________ ("It is black letter law that plea agreements, 'though part and parcel of criminal jurisprudence, are subject to contract-law -5- standards in certain respects.'") (quoting United States v. ______________ Hogan, 862 F.2d 386, 388 (1st Cir. 1988)); see also United States _____ ________ _____________ v. Papaleo, 853 F.2d 16, 19 (1st Cir. 1988) ("A contractual _______ approach to plea agreements ensures not only that constitutional rights are respected, but also that the integrity of the criminal process is upheld."); United States v. Gonz lez-S nchez, 825 F.2d _____________ ________________ 572, 578 (1st Cir. 1987) ("Contractual principles apply insofar as they are relevant to determining what the government owes the defendant."). Applying contract-law principles in this case, we first turn to the specific language of the Agreement. See Anderson, ___ ________ 921 F.2d at 338. That language is unambiguous: You will submit, if you are requested to do so, when requested to do so, to polygraphic examination (lie detector test) should the United States deem it appropriate. If you fail to submit or if in the opinion of the examiner your your answers indicate deception you will be in answers indicate deception you will be in breach of this agreement. (emphasis in breach of this agreement. original) This obligation was thoroughly discussed during the plea colloquy between defendant and the trial judge. Indeed, defendant's own comments leave little doubt that he fully understood that the government's obligation to file a 5K1.1 motion was conditioned on his submitting to a polygraph examination if asked, and passing that examination "in the opinion of the examiner": THE COURT: . . . And if in the opinion of the examiner your answers indicate deception, you will be in breach of the -6- agreement. Have you understood what that means? THE DEFENDANT: Yes your Honor. THE COURT: That means that if you don't pass the lie detector test it will be understood that you are not providing truthful and honest assistance and information that is expected of you. THE DEFENDANT: I understand, your Honor. The only plausible interpretation of the Agreement, given its unambiguous language and defendant's acknowledged understanding, is that it means exactly what it says. See United ___ ______ States v. Atwood 963 F.2d 476, 479 (1st Cir. 1992) (Court ______ ______ interpreted plea agreement to mean precisely what it said where defendant signed and agreed to it in the presence of judge). Defendant does not claim that the examiner's opinion was rooted in bad faith or was based on anything but his own objective interpretation of the examination results. Rather, he argues that because a polygraph examination is an inherently unreliable means of determining truth, and such results are not generally admissible in courts of law, that part of the Agreement requiring him to submit to and pass the test should be deemed void. But defendant was not "required" to accept those terms of the Agreement. In this case both defendant and the government agreed to the polygraph's use as the standard by which defendant's performance of his obligation to be completely truthful would be measured by the government. Both parties presumably had sufficient confidence in its reliability for that purpose. Having agreed to the test, whatever its scientific -7- weaknesses might be,1 defendant cannot now be heard to say that his own promise was illusory or that he was somehow misled. Nor can he credibly argue that the government's discretionary decision not to file the departure motion was made in bad faith or without rational basis. Defendant's integrity as a possible witness in other matters was certainly undermined by his failure to answer questions truthfully. See, e.g., United States v. ___ ____ ______________ Catalucci, 36 F.3d 151 (1st Cir. 1994). Besides, defendant does _________ not seriously contest the fact that he did not answer all questions truthfully. Because the defendant was in breach of his obligation to be "completely truthful," the government was entitled to exercise its discretion not to file a downward departure motion under Guideline 5K1.1. B. District Court's Calculation of Defendant's Total B. District Court's Calculation of Defendant's Total Offense Level Offense Level The district court set defendant's total offense level under the Guidelines at 15, in part by upwardly adjusting his base offense level pursuant to both U.S.S.G. 2F1.1(2) (more than minimal planning) and U.S.S.G. 3B1.3 (abuse of a position of trust). At the same time, the district court refused a downward adjustment under U.S.S.G 3B1.2 (minor or minimal  ____________________ 1 We agree with the conclusion of the Court of Appeals for the Third Circuit in United States v. Swinehart, 614 F.2d 853 n.2 (3d _____________ _________ Cir.), cert. denied, 449 U.S. 827 (1980): "Although the _____________ infallibility of polygraphs is arguable, we decline to hold that the Government cannot rely on the tests where the parties agree to such reliance in a plea bargain." -8- participant in offense). Defendant argues that the calculation was clearly erroneous. Again, we disagree. "Once the court of appeals has defined the guideline's meaning and scope, it reviews the sentencing court's fact finding only for clear error." United States v. St. Cyr, 977 F.2d 698, _____________ _______ 701 (1st Cir. 1992) (citing United States v. Tardiff, 969 F.2d _____________ _______ 1283, 1289 (1st Cir. 1992)); United States v. Connell, 960 F.2d _____________ _______ 191, 197 (1st Cir. 1992); see also United States v. Rosado- _________ _____________ _______ Sierra, 938 F.2d 1-2 (1st Cir. 1991) ("[D]efendant . . . can ______ prevail on appeal only by demonstrating that the district court's determination as to his role in the offense was clearly erroneous.") (per curiam); United States v. Garc a, 954 F.2d 12, _____________ ______ 18 (1st Cir. 1992) ("Absent a mistake of law, we review a sentencing court's role-in-the-offense determination only for clear error.") (citing United States v. Dietz, 950 F.2d 50, 52 _____________ _____ (1st Cir. 1991)); United States v. Akitoye, 923 F.2d 221, 227 _____________ _______ (1st Cir. 1991)). Additionally, "where there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous." United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. _____________ ____ 1990); see also Rosado-Sierra, 938 F.2d at 2. ________ _____________ The district court's determination in this case is supported by the record, and a two-level upward adjustment for more than minimal planning under 2F1.1(b)(2)(A) was not clearly erroneous. The distinction between "minimal" and "more than minimal planning" as those terms are used in the Guidelines is -9- illustrated by the example given in the accompanying comment: "a single taking accomplished by a false book entry would constitute only minimal planning . . . [while] several instances of taking money, each accompanied by false entries [would constitute more than minimal planning]." 1B1.1(f), comment. Here, the record reveals a number of instances of taking money by false entries as part of an overall scheme to defraud. More than minimal planning was obviously required to carry out this sophisticated false claims scheme. See United States v. Brandon, 17 F.3d 409, 459 ___ _____________ _______ (1st Cir. 1994) ("[W]e are not inclined to reverse a finding of more than minimal planning unless the evidence compels the conclusion that the defendant's actions were purely opportune or 'spur of the moment.'") (citing United States v. Gregorio, 956 ______________ ________ F.2d 341, 343 (1st Cir. 1989)); cf. also United States v. Fox, __ ____ _____________ ___ 889 F.2d 357, 361 (1st Cir. 1989) ("[W]e cannot conceive of how even obtaining one fraudulent loan would not require more than minimal planning."). The trial judge properly concluded from the undisputed facts that defendant's participation in at least seven separate "false entries" for the purpose of defrauding CIS of approximately $1.4 million, required more than minimal planning, and we will not disturb that finding on appeal. Defendant also asserts that the district court erred by increasing his offense level by two based on his alleged abuse of a position of trust, pursuant to U.S.S.G. 3B1.3. That guideline calls for an upward adjustment where: [T]he defendant abused a position of public or private trust, or used a -10- special skill, in a manner that significantly facilitated the commission or concealment of the offense. U.S.S.G. 3B1.3. When reviewing a district court's upward adjustment under 3B1.3, we first determine the legal meaning of terms such as "position of private trust," then we ask "whether the defendant actually used the position to facilitate or conceal the offense . . . and if so, whether the position contributed to the misconduct in a significant way." United States v. Tardiff, 969 _____________ _______ F.2d 1283, 1289 (1st Cir. 1992). The district court's determination on each point is of course afforded due deference and is reviewed only for clear error. Id. __ Defendant unquestionably held a position of private trust. As we have stated before, "'the primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong.'" Id. (citing United States __ _____________ v. Hill, 915 F.2d 502, 505 (9th Cir. 1990)). Defendant, an ____ officer of the corporation, occupied a high level position that not only enabled him to exercise broad discretionary authority over the payment of claims made against CIS's policies, but, at the same time, allowed him to "commit difficult to detect wrongs," id., such as the fraudulent scheme charged in this case. ___ The record establishes that defendant actually used his position to facilitate or conceal the crime, and so, the position contributed to the misconduct. Defendant conceded, after all, -11- that as vice president for claims he reopened previously closed cases and approved payment of known false claims filed in those cases. Furthermore, it is self-evident that defendant's position within the company enabled him to facilitate both the execution and attempted concealment of that scheme. The district court's finding that defendant abused his position of private trust, warranting an upward adjustment under 3B1.3, was fully supported by the record. The district court's decision not to downwardly adjust under 3B1.2 (minor or minimal participant in the offense) is also fully justified by the record. U.S.S.G. 3B1.2 provides for a downward adjustment where defendant's role "in committing the offense . . . makes him substantially less culpable than the average participant." The scheme involved here required each participant to perform a significant and necessary role; the contribution of one participant was no less significant than that of another in effecting the scheme. Accordingly, the district court correctly determined that defendant was not substantially less culpable than his associates and was not entitled to a downward adjustment. III. CONCLUSION III. CONCLUSION __________ For the reasons stated above, we affirm the district court in all respects. AFFIRMED. ________ -12-