# UNITED STATES of America

v.

## Dinart SERPA, Defendant.

## No. CRIM.A.02–10118–WGY.

United States District Court,
D. Massachusetts.

March 12, 2003.

---

*MEMORANDUM*

YOUNG, Chief Judge.

## I. INTRODUCTION

On November 26, 2002, the defendant, Dinart Serpa ("Serpa"), pled guilty to three counts of filing false income tax returns in violation of 26 U.S.C. § 7206(1). At that time, the Federal Bureau of Prisons ("the Bureau") was continuing to follow its long-standing policy of honoring judicial recommendations to place Zone C offenders, such as Serpa, in community correction centers for the imprisonment portions of their sentences.

After taking Serpa's plea, the Court set Serpa's sentencing for January 14, 2003. Between November 26, 2002 and January 14, 2003, however, a major change oc-

curred. In a memorandum to federal judges dated December 20, 2002, the Bureau's Director stated as follows:

> This memorandum informs you that the Bureau of Prisons (Bureau) is implementing a significant procedure change regarding inmate designations to community correction centers (CCC) (also known as "halfway-houses"). The Bureau has had a practice of honoring some judicial recommendations to place inmates in CCCs for the imprisonment portions of their sentences. Effective immediately, this practice will no longer ·be followed. The Bureau will not use CCCs as a substitute for imprisonment.

Memorandum for Federal Judges, December 20, 2002, issued by Kathleen Hawk Sawyer, Director, Federal Bureau of Prisons ("December 20 directive"), ¶ 1.

Serpa's plea and sentencing thus straddled a regime change of significant proportion. On this ground, among others, Serpa moved for a downward departure, arguing that "[t]he unfairness of this abrupt change falls hardest on those such as Serpa, who entered into plea agreements and pleaded guilty with every reason to believe that if they received a sentence of imprisonment it would be served entirely in a CCC." Def.'s Sentencing Mem. [Docket No. 8] at 8–9. Thus, Serpa argued, a downward departure was warranted to avoid any hint of an ex post facto violation in his sentence. *Id.* at 8.

At Serpa's sentencing on January 14, 2003, the Court granted Serpa a downward departure on this ground[1] and sentenced him to four months in custody of the United States Attorney General, presumably to be served in federal prison, to be followed by one year of supervised release. The

---

1. The Court explicitly stated that the downward departure was based solely on ex post facto concerns and expressed no opinion as to whether a downward departure was also war-

ranted on the other two grounds raised by Serpa: aberrant circumstances and extraordinary restitution. 1/14/03 Hr'g Tr. [Docket No. 13] at 30–33.

Court considered the four month prison sentence to be the rough equivalent of a 10–month community confinement sentence.[2] The following memorandum serves to explain the reasoning behind the Court's decision to grant a downward departure in this case.

## II. DISCUSSION

At Serpa's sentencing, the Court determined that Serpa's adjusted offense level was 12 and that his criminal history category was I. 1/14/03 Hr'g Tr. at 3. Thus, Serpa fell within Zone C of the Sentencing Guidelines and faced a sentence of 10 to 16 months. *Id.; see* U.S.S.G. § 5A.

The Sentencing Guidelines themselves state that a Zone C sentence must be served either by "a sentence of imprisonment" or by "a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention ... provided that at least one-half of the minimum term is satisfied by imprisonment." U.S.S.G. § 5C1.1(d). Since the enactment of the Sentencing Guidelines in 1987, the Bureau—which has statutory authority to designate the place of imprisonment for federal inmates pursuant to 18 U.S.C. § 3621(b)—has repeatedly and explicitly stated that community confinement centers qualify as penal or correctional facilities, and therefore that the "imprisonment" portion of an offender's sentence may be served in community confinement. *See, e.g., Culter v. United States,* 241 F.Supp.2d 19, 21–22 (D.D.C.2003); *Reno v. Koray,* 515 U.S. 50, 62, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (noting that in its Program Statement No. 7310.02, issued on October 19, 1993, the Bureau described itself as having the authority "to place sentenced prisoners in community correc-

tions centers, since such centers met 18 U.S.C. § 3621(b)'s definition of a 'penal or correctional facility' "); U.S. Dept. of Justice, Federal Bureau of Prisons Program Statement No. 7310.04 (December 16, 1998) (stating that "the Bureau is not restricted ... in designating a CCC for an inmate").

Prior to the December 20, 2002 directive, the Bureau's practice of honoring judicial recommendations to place Zone C offenders in community confinement for the imprisonment portion of their sentences was a well-known and routinely accepted aspect of sentencing nationwide. As the *Culter* court noted:

> Across the country, the [Bureau's] statements and its actions told judges that if they recommended CCC placement for a Zone C offender ..., those recommendations would generally be followed .... These practices were entirely routine, and were all but taken for granted by all participants: the BOP, the Probation Office, the U.S. Attorney's Office, the defense bar, and the judiciary.

At 21–22. Indeed, the policy was discussed in detail by the judges of this very District at the November 2002 Federal Judicial Forum event organized by the District of Massachusetts for members of the Bar.

As such, the December 20, 2002 directive abrogating this policy constituted a striking reversal of an established practice that had been in place for over fifteen years. This Court expresses no view as to the advisability or desirability of this change. In the Court's view, however, the change does raise an ex post facto concern with respect to the sentencing of Zone C offenders, such as Serpa, who pled guilty prior to the December 20, 2002 directive.

---

**2.** Based on Serpa's adjusted offense level and criminal history, his sentencing guideline range was between 10 and 16 months.

The Ex Post Facto Clause of the Constitution provides that "no State shall ... pass any ... ex post facto Law." U.S. Const. Art. I, § 10. As the Supreme Court has explained, "[t]o fall within the *ex post facto* prohibition, a law must be retrospective—that is, it must apply to events occurring before its enactment—and it must disadvantage the offender affected by it, by altering the definition of criminal conduct or increasing the punishment for the crime." *Lynce v. Mathis,* 519 U.S. 433, 441, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997) (citations and internal quotations omitted).

Within the sentencing context, the First Circuit has held that to avoid an ex post facto violation, "revisionary amendments to the [sentencing] guidelines—that is, amendments which change the law in a substantive way—cannot be applied retroactively by a sentencing court to a defendant's disadvantage." *David v. United States,* 134 F.3d 470, 476 (1st Cir.1998); *see also United States v. Maldonado,* 242 F.3d 1, 5 (1st Cir.2001) (stating that "we ordinarily employ the guidelines in effect at sentencing only where they are as lenient as those in effect at the time of the offense; when the guidelines have been made more severe in the interim, the version in effect at the time of the crime is normally used, as a matter of policy and to avoid any hint of *ex post facto* increase in penalty"); *United States v. Prezioso,* 989 F.2d 52, 53 (1st Cir.1993) ("[W]e normally apply amendments retroactively only if they clarify a guideline, but not if they substantively change a guideline.").

■ When an amendment to the Sentencing Guidelines merely clarifies an ambiguous provision, however, no ex post facto violation ensues from using the new regulation, and it should be applied. *See, e.g., Isabel v. United States,* 980 F.2d 60, 62 (1st Cir.1992); *Prezioso,* 989 F.2d at 53. Similarly, a number of circuits have held

that an amendment or regulation that simply corrects an incorrect statutory interpretation can be applied retroactively without raising ex post facto concerns because "the Ex post facto clause of the Constitution does not give [defendants] a vested right in such an erroneous interpretation." *Mileham v. Simmons,* 588 F.2d 1279, 1280 (9th Cir.1979); *see also Stephens v. Thomas,* 19 F.3d 498, 500 (10th Cir.1994) (stating that the Ex Post Facto Clause "does not prohibit ... the correction of a misapplied existing law which disadvantages one in reliance on its continued misapplication"); *Cortinas v. United States Parole Comm'n,* 938 F.2d 43, 46 (5th Cir.1991) (same); *Glenn v. Johnson,* 761 F.2d 192, 194–95 (4th Cir.1985) (noting that plaintiffs had no ex post facto case since the "correction of an erroneous interpretation" was "not only foreseeable but indeed was inescapable"); *Caballery v. United States Parole Comm'n,* 673 F.2d 43, 47 (2d Cir.1982) (quoting *Mileham* ).

As an initial matter, the Court notes that the Sentencing Guidelines were not themselves amended by the December 20, 2002 directive. Rather, the directive set forth a change of Bureau policy, pursuant to the guidance of the Department of Justice's Office of Legal Counsel. Accordingly, the analytic framework described above is not directly controlling here. Nevertheless, because the directive altering the Bureau's policy works a serious disadvantage against defendants who pled guilty prior to it, the Court considers the above framework relevant in assessing whether an ex post facto concern is present here. *See Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) ("[T]wo critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.").

With reference to the above framework, it is clear that the December 20, 2002 directive did not simply clarify an ambiguous provision. The directive itself refers to the new policy as "a significant procedure change." December 20 Directive, ¶ 1. Indeed, at oral argument, the Government acknowledged that the directive was a change and rested its opposition to Serpa's requested downward departure on the grounds that the directive corrected an erroneous Bureau policy. 1/14/03 Hr'g Tr. at 16–18. This is consistent with the Bureau's own statement that the "change follows recent guidance from the U.S. Department of Justice's Office of Legal Counsel (OLC), .... [which] has determined that the Bureau's practice of using CCCs as a substitute for imprisonment contravenes well-established caselaw, and is inconsistent with U.S.S.G. § 5C1.1." December 20 Directive, ¶ 2.

A finding that a new regulation amounts to a correction of an erroneous statutory interpretation usually disposes of any ex post facto concerns, as noted above, and some courts considering ex post facto challenges to the December 20, 2002 directive have rejected them for precisely that reason. *See United States v. Gilbride*, No. 3:00CR0320, 2003 WL 297563, at *2–3 (M.D.Pa. Jan. 31, 2003); *United States v. Schild*, Nos. 00–40021–01, 03–3028–RDR, 2003 WL 260672, at *3 (D.Kan. Jan. 21, 2003).

Here, however, the Court is of opinion that even if the change can be accurately characterized as correcting an erroneous interpretation, the hint of an ex post facto violation still remains with respect to defendants such as Serpa. The underlying rationale for rejecting ex post facto challenges to new regulations that correct erroneous interpretations is the presumed *foreseeability* of those changes. As the *Stephens* court explained, "when the current interpretation of a statute is foresee-able, there can be no Ex Post Facto Clause violation." 19 F.3d at 500; *see also Lustgarden v. Gunter*, 966 F.2d 552, 554 (10th Cir.1992). This foreseeability element protects against the "lack of fair notice," a central concern of the Ex Post Facto Clause. *Weaver*, 450 U.S. at 30, 101 S.Ct. 960; *Lynce* 519 U.S. at 441, 117 S.Ct. 891. The foreseeability of a change, therefore, provides assurance that notice indeed existed and that no ex post facto violation is present.

■ In this case, the length of time during which the prior policy was in effect, the nationwide scope and application of the policy, the Bureau's explicit codification of the policy, and the widespread recognition and discussion of the policy by the Bureau, Probation Office, U.S. Attorney's Office, the defense bar, and the judiciary—when taken in combination—undermine any argument that the recent change was or should have been "foreseeable" to defendants such as Serpa. As noted above, in the same month that Serpa decided to plead guilty, the practice was being discussed by judges and lawyers as accepted policy at the Federal Judicial Forum held by this very District. Given these pronouncements, there was no reason for Serpa to believe that this longstanding policy would change in the next two months; indeed, all indications—from authoritative sources—were to the contrary. *Cf. Smith v. Scott*, 223 F.3d 1191, 1196 (10th Cir. 2000) (resting a determination that current agency interpretation was not foreseeable and thus violated the Ex Post Facto Clause partially on grounds that "[t]here were different interpretations throughout [the agency], affecting a large number of prisoners on escape status over a course of several years. *[The inmate] could not be expected to understand or foresee the current interpretation of [the regulation] when [the agency's] case managers—the*

*officials entrusted with implementing the regulation—could not.*") (emphasis added).

As such, a sentence that did not make any allowances for Serpa's reasonable *inability* to foresee such a change when deciding whether to plead guilty would, in this Court's view, raise the specter of an ex post facto violation. *See Ashkenazi v. Attorney General of United States,* No. CIV. A.03–062–GK, 2003 WL 403091, at * 5–6 (D.D.C. Feb. 24, 2003) (finding that the prisoner had a likelihood of success on the merits in his ex post facto challenge to the Bureau's December 20, 2002 directive because "the change in BOP policy prohibiting it from exercising its discretion to determine a prisoner's place of confinement was not foreseeable .... There is nothing in the statute or BOP's prior implementation of the statute to suggest that this well-known and long-standing policy would be abruptly changed."). Given the First Circuit's admonition in *Maldonado* that any hint of an ex post facto sanction should be avoided, 242 F.3d at 5, this Court therefore ruled that a downward departure was warranted.

■ Further, it ought be remembered that a plea bargain is properly analyzed under contract principles. *See, e.g., United States v. Santiago–Gonzalez,* 66 F.3d 3, 6 (1st Cir.1995) (stating that the First Circuit has "recognized that principles of contract law often provide useful references when construing plea agreements"); *United States v. Papaleo,* 853 F.2d 16, 19 (1st Cir.1988) ("A contractual approach to plea agreements ensures not only that constitutional rights are respected, but also that the integrity of the criminal process is upheld as plea agreements are respected as 'pledges of public faith.'"); *United States v. Gonzalez–Sanchez,* 825 F.2d 572, 578 (1st Cir.1987) ("When a defendant has entered into a plea agreement with the government, the court must ensure that he

receives what is reasonably due him under the agreement. Contractual principles apply insofar as they are relevant in determining what the government 'owes' the defendant.").

Serpa's plea agreement was negotiated and signed without any hint of the regime change about to occur. In order that the good faith of the government not be impugned, specific performance is the proper remedy for a breach on the part of the government. *See, e.g., Kingsley v. United States,* 968 F.2d 109, 113 (1st Cir.1992) ("The government's breach of a plea agreement is ordinarily remedied either by specific performance or by allowing the defendant to vacate his guilty plea .... Specific performance, the less extreme remedy, is preferred."). Because the Court is without authority to order specific performance here, the Court sought to achieve a roughly comparable result through its four-month sentence.

## III. CONCLUSION

For the foregoing reasons, the Court granted Serpa's motion for a downward departure [Docket No. 9]. The Court has expressed no opinion as to whether a downward departure is also warranted on grounds of aberrant circumstances or extraordinary restitution.