GOODWIN, District Judge,
dissenting:
The majority concludes that IIRIRA’s repeal of discretionary relief under § 212(c) does not attach a new disability to Chambers’s past conduct. This is because the majority considers Chambers’s decision to go to trial to be the “relevant past conduct,” ante at 293, for the purpose of determining a retroactive effect. I part company with the majority simply because I find the relevant conduct to be Chambers’s crime of conviction rather than his decision to go to trial. My logic is simple. Whether before or after amendment, the only statutory consequences were those flowing from Chambers’s criminal conduct. Without IIRIRA § 304(b)’s repeal of § 212(c) waivers, an alien who committed armed robbery faced imprisonment and possible deportation. With IIRIRA § 304(b), an alien committing armed robbery faces imprisonment and certain deportation.[1] To my mind, *294 this change impermissibly “attaches new legal consequences to events completed before” the enactment of IIRIRA, and therefore has a retroactive effect. Landgraf v. USI Film Prods., 511 U.S. 244, 270, 114 S.Ct. 1483 (1994). Accordingly, I respectfully dissent. I will first explain why I believe that we must focus on Chambers’s underlying criminal conduct when determining whether this change in the law has a retroactive effect. With that focus in mind, I will then explain why this change in the law has a retroactive effect as applied to Chambers.
I.
The majority, in determining whether the repeal of § 212(c) has an impermissible retroactive effect, considers Chambers’s conduct at trial but not his underlying primary conduct, that is, the criminal conduct which lead to his conviction. While the Supreme Court in St. Cyr did consider the alien’s secondary conduct — his decision to plead guilty — the Court did not suggest that the alien’s guilty plea was the only relevant past conduct for the purposes of determining retroactive effect.[2] A defendant’s underlying, primary conduct has always served as the starting point for a retroactivity analysis. For example, in Domond v. INS, 244 F.3d 81 (2d Cir.2001), which involved the very issue presented in this case, the Second Circuit focused on whether the elimination of § 212(c) altered “the punishment for the [alien’s] underlyr ing criminal conduct.” Id. at 86 (emphasis added).[3] See also Tasios v. Reno, 204 F.3d 544, 551 (4th Cir.2000) (“In considering whether § 212(c) would alter the legal effect of conduct that predates AEDPA’s enactment, we do not limit our analysis to the conduct that resulted in the felony conviction.”) (emphasis added).
When determining whether to apply a new rule of law to a pending case, courts often draw a distinction between procedural and substantive rules, a distinction that turns on what type of conduct is regulated by the new rule. “The relevant rule is that statutes which change primary (out of court) duties, for example statutes that impose new tort liabilities, are applied pro *295 spectively, while statutes that change merely procedures are applied retroactively.” LaGuerre v. Reno, 164 F.3d 1035, 1041 (7th Cir.1998). The logic behind this approach is that “[b]ecause rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make the application of the rule at trial retroactive.” Landgraf, 511 U.S. at 275, 114 S.Ct. 1483. The § 212(c) waiver, and the corresponding elimination of that waiver by IIRIRA § 304(b), are clearly both substantive laws that regulate primary conduct, not merely procedural rules that regulate subsequent conduct such as litigation decisions. The conduct being regulated by § 212(c) (and its elimination by § 304(b)) is, first and foremost, the underlying criminal conduct leading to a conviction that rendered the alien subject to deportation and therefore in need of a § 212(c) waiver. Accordingly, it is counterintuitive to only consider the effect of this substantive legal change on Chambers’s prior secondary conduct, as opposed to its effect on his prior criminal conduct.
In this ease, the majority focuses on Chambers’ secondary conduct to the exclusion of considering his primary conduct, the crime itself. While the “relevant past conduct” for even a substantive legal change (such as the elimination of § 212(c) waivers) may sometimes include secondary conduct, the main focus should be on the underlying criminal conduct. With this focus on Chambers’s underlying criminal conduct in mind, I will now turn to consider whether IIRIRA’s elimination of § 212(c) relief from deportation has an impermissible retroactive effect.
II.
As the Supreme Court explained in St. Cyr, “[t]here is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation.” INS v. St. Cyr, 533 U.S. 289, 325, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Prior to IIRIRA, an alien committing an aggravated felony was faced with imprisonment and possible deportation. After IIRIRA’s elimination of § 212(c) waivers, an alien committing those same aggravated felonies faces imprisonment and certain deportation.[4] This change “attaches new legal consequences to events completed before” the enactment of IIRIRA, and therefore has a retroactive effect. Landgraf, 511 U.S. at 270, 114 S.Ct. 1483. Accordingly, IIRIRA’s repeal of § 212(c) should not be applied retroactively to Chambers.
I agree with the majority’s rejection of Chambers’s argument that he relied on the availability of § 212(c) when he decided to go to trial. This is not a case, like St. Cyr, where the unfairness of retroactively applying the rule stems from reliance concerns. As the majority acknowledges, however, rebanee is merely one way to prove an unfair retroactive effect; it is by no means the only test of unfair retroactivity. See Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 947, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997); Velasquez-Gabriel v. Crocetti, 263 F.3d 102, 109 (4th Cir.2001). Detrimental reliance is simply one manifestation of the *296 unfairness that can result from instability in the law. But the presumption against retroactivity is grounded in broader and more fundamental concerns. As Justice Scalia has explained, there is “timeless and universal human appeal” to the notion that “the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place.” Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 855, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring). Apart from reliance, the presumption against retroactivity reflects the more basic concern that people “should have an opportunity to know what the law is and to conform their conduct accordingly.” Landgraf, 511 U.S. at 265, 114 S.Ct. 1483. This concern “relates to concepts of governmental legitimacy.” Nancy Morawetz, Rethinking Retroactive Deportation Laws and the Due Process Clause, 73 N.Y.U. L.Rev. 97, 136 (1998). “[T]he government engenders greater respect for its laws and its lawmaking institutions if it can commit to the stability of its laws.” Jill E. Fisch, Retroactivity and Legal Change: an Equilibrium Approach, 110 Harv. L.Rev. 1055. 1106 (1997). That is, the government operates with greater fairness, and thus greater legitimacy, when it does not change the rules midway through the game. Thus the presumption against ret-roactivity, like the various constitutional protections against retroactive legislation, serves to “limit[ ] the sovereign’s ability to use its lawmaking power to modify bargains it has made with its subjects.” Lynce v. Mathis, 519 U.S. 433, 440, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997).[5] Regardless of whether a particular individual actually relies to his detriment on the legal regime, the government must at least give individuals the opportunity to know the law and behave accordingly.
It is instructive to compare Chambers’s situation to that of the defendant in Hughes. In Hughes, the question before the Court was whether the elimination of a defense to statutory qui tarn actions had a retroactive effect, such that the change should only apply prospectively. Hughes, 520 U.S. at 941, 117 S.Ct. 1871. Between 1982 and 1986, the False Claims Act required dismissal of qui tarn actions that were based on evidence or information that was already in the possession of the government when the action was brought. Id. at 945, 117 S.Ct. 1871. In 1986 Congress changed the FCA to remove this limitation except in certain circumstances. Id. at 946, 117 S.Ct. 1871. The qui tarn plaintiff argued that this amendment had no retroactive effect because it did not create a new cause of action or impose liability where none had existed previously. Id. at 948, 117 S.Ct. 1871. Even under the pre-1986 version of the FCA, the plaintiff argued, an FCA defendant faced monetary liability for false claims against the government because the United States could pursue the claim against the defendant regardless of whether a qui tarn plaintiff could bring the claim. Id. at 948-49, 117 S.Ct. 1871. The 1986 version of the FCA simply meant that, in cases where the evidence of a false claim was in the possession of the government, a false claims law *297 suit could be brought by a qui tam plaintiff as well as by the United States. A unanimous Supreme Court rejected this argument, noting that while “monetary liability faced by an FCA defendant is the same whether the action is brought by the Government or by a qui tam relator, the 1986 amendment eliminates a defense to a qui tam suit ... and therefore changes the substance of the existing cause of action for qui tam defendants by ‘attaching] a new disability, in respect to transactions or considerations already past.’ ” Id. at 948, 117 S.Ct. 1871.
There was no suggestion in Hughes that the 1986 amendment to the qui tam statute raised reliance concerns — that is, that the defendant had submitted a false claim to the government in rebanee on the fact that only the government, not a qui tam plaintiff, could bring an action based on that false claim. Such a claim of rebanee would have been as implausible as a claim of reliance in this case — that when Chambers committed robbery with a deadly weapon, he rebed on the fact that he would only be subject to imprisonment and possible deportation rather than imprisonment and certain deportation. Hughes reflects the view that, apart from whether an individual actually relies on the preexisting legal regime, courts should not presume that Congress meant to change the rules midway through the game. Hughes illustrates how “[e]ven when the conduct in question is morally reprehensible or ibe-gal, a degree of unfairness is inherent whenever the law imposes additional burdens based on conduct that occurred in the past.” Landgraf, 511 U.S. at 282 n. 35, 114 S.Ct. 1483. Chambers’s armed robbery was illegal at the time it was committed, and he has been imprisoned accordingly. The repeal of the § 212(c) waiver, however, “imposes additional burdens on conduct that occurred in the past.” Id. Accordingly, we should not, as a matter of judicial presumption, apply this change retroactively unless explicitly instructed to do so by Congress.
Chambers’s situation can also be contrasted with that of the alien in Velasquez-Gabriel v. Crocetti, 263 F.3d 102 (4th Cir.2001). Velasquez Gabriel was an alien who had illegally reentered the United States while under a prior order of removal. Id. at 103-04. After his illegal reentry, the law changed so as to require reinstatement of his prior order of removal without the opportunity to reopen or obtain review of that prior order. Id. at 104. The court held that this change in the law did not operate in an impermissibly retroactive manner. The court first explained that Velasquez Gabriel had not taken any actions in reliance on the old law; thus, the law was not retroactive for that reason. Id. at 109. The court then noted that even absent proof of reliance, the change in the law might still have a retroactive effect. Another concern underlying retroactivity, the court noted, is that persons subject to the law have an “opportunity to know what the law [was] and to conform [his] conduct accordingly.” Id. at 109-10 (quotations and citations omitted). Velasquez Gabriel, the court explained, had seven months to apply for adjustment of status before the new law was enacted and another six months after that to apply for adjustment of status before the new law went into effect. Id. at 109. Thus, Velasquez-Gabriel had had over a year during which he could have taken affirmative action to request adjustment of status under the old legal regime before the law changed and deprived him of that opportunity. The court explained that “Velasquez-Gabriel’s failure to apply to adjust his resident status before the new law took effect fatally undermines his contention that § 241(a)(5)’s appbeation to him ‘attaches new legal consequences to events complet *298 ed before its enactment.’” Id. at 110 (quoting St. Cyr, 533 U.S. at 321, 121 S.Ct. 2271) (emphasis omitted). Here, in contrast, Chambers’ fate was out of his hands once he had committed the armed robbery. After that act, Chambers faced imprisonment and, once Congress mandated that his crime was an aggravated felony, the possibility of deportation unless he was granted a § 212(c) waiver. He had no further opportunity, as Velasquez Gabriel did, to “know what the law was and to conform his conduct accordingly.” Id. at 109-10 (quotations and alterations omitted). From the time of the robbery on, he was at the mercy of the government both in his criminal prosecution and in his subsequent deportation proceedings.
I agree with the majority’s characterization of the law except insofar as it fails to consider any retroactive effect to Chambers’s underlying criminal conduct. Applying the majority’s analysis on pages 11-12 of its opinion to that underlying primary conduct, I would conclude that IIRI-RA’s repeal of the discretionary relief provision does “attach[ ] a new disability,” Hughes, 520 U.S. at 947, 117 S.Ct. 1871, with respect to the relevant past conduct, ie., Chambers’s commission of the armed robbery. The repeal “attaches new legal consequences to events completed before [IIRIRA’s] enactment,” Martin v. Hadix, 527 U.S. 343, 357-58, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999) (internal quotation marks omitted), and gives “a quality or effect to acts or conduct which they did n'ot have or did not contemplate when they were performed,” Union Pac. R.R. Co. v. Laramie Stock Yards Co., 231 U.S. 190, 199, 34 S.Ct. 101, 58 L.Ed. 179 (1913), because IIRIRA changed the impact of Chambers’s commission of armed robbery on his immigration status. Because “the legal effect of [Chambers’s criminal] conduct is determined by subsequently enacted law, that law operates retroactively.” Tasios, 204 F.3d at 551. Absent a clear Congressional indication that this change in the law should retroactively deprive Chambers of the possibility of relief from otherwise certain deportation, the traditional presumption against retroactivity should bar the retroactive loss of the § 212(c) waiver in this case. Accordingly, I would reverse the decision of the district court.

. I say “without IIRIRA § 304(b)” and "with IIRIRA § 304(b)” rather than “prior to IIRI-RA” and "after IIRIRA” because, as the majority explains, prior to IIRIRA Chambers’s armed robbery conviction and sentence did not render him deportable at all. IIRIRA changed the law in two relevant respects to the detriment of aliens like Chambers. First, it expanded the definition of "aggravated felony” so that Chambers's armed robbery conviction now constitutes an aggravated felony and renders him eligible for deportation. *294 Second, it eliminated § 212(c) waivers for aliens convicted of aggravated felonies. This first change clearly applies to Chambers, because, as the majority explains, Congress explicitly said so. See ante at 292. Thus, when considering whether § 304(b)'s elimination of § 212(c) waivers has a retroactive effect by changing the legal landscape prior to IIRIRA, one must treat the expansion of the "aggravated felony” definition as part of that pre-IIRIRA legal landscape.

. I use the term "primary conduct” to refer to the conduct that is the subject of the regulation in question and the term "secondary conduct” to refer to subsequent conduct that is not the direct subject of the regulation, such as decisions in the course of judicial proceedings.

. The Domond court went on to conclude that "loss of the Section 212(c) hearings, while clearly a hardship, does not impose a new legal consequence on Domond's pre-AEDPA criminal conduct.” Id. at 86. Because "waivers from Section 212(c) hearings were [always] purely discretionary,” tire court reasoned that their loss did not constitute a new legal consequence. Soon after Domond was decided, the Supreme Court stated that "the fact that § 212 relief is discretionary does not affect the ... conclusion [that § 304(b) has a retroactive effect]. There is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation.” INS v. St. Cyr, 533 U.S. 289, 325, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Thus the court in Do-mond properly asked whether the revocation of § 212(c) waivers imposed a new legal consequence on the underlying criminal conduct, as opposed to simply the alien’s conduct at trial, but then mistakenly concluded that the cancellation of a discretionary form of relief imposed no new legal consequences on that conduct.

. As noted above, supra n. 1, Chambers's armed robbery conviction did not constitute an “aggravated felony” prior to IIRIRA. But because Congress explicitly instructed that IIRIRA's expanded definition of "aggravated felony” would apply to crimes committed pri- or to IIRIRA’s enactment, we must (for the limited purpose of determining the retroactive effect of § 340(b)) treat Chambers’s armed robbery as an “aggravated felony” from the moment it was committed.

. The presumption against retroactivity does not place absolute limits on Congress’s power to enact retroactive legislation, as does, for example, the Ex Post Facto clause or the Due Process Clause. See Lynce, 519 U.S. at 439-40, 117 S.Ct. 891. Nonetheless, it forces Congress to bear the political weight of the perceived unfairness of retroactive legislation by requiring Congress to explicitly and clearly state that the legislation will be applied retroactively. Thus, while the presumption is not an absolute barrier, it does place a constraint on retroactive legislation by permitting retro-activity only when Congress is willing to say so explicitly.