# FIFTH DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

Case No. 5D23-1569
LT Case Nos. 2004-CF-001378
2004-CF-001380

_____

STATE OF FLORIDA,

　　Petitioner,

　　v.

TROY VICTORINO and JERONE
HUNTER,

　　Respondents.

_____


Petition for Certiorari Review of Order from the Circuit Court
for Volusia County.
Randell H. Rowe, III, Judge.

Ashley Moody, Attorney General, Tallahassee, Christina Z.
Pacheco, Senior Assistant Attorney General, Tampa, and Doris
Meacham, Senior Assistant Attorney General, Daytona Beach, for
Petitioner.

Ann E. Finnell and Gonzalo Andux, of Finnell, McGuinness,
Nezami & Andux, P.A., Jacksonville, for Respondent Troy
Victorino.

Garry Wood, Palatka, and Allison Ferber Miller, of Ripley
Whisenhunt, PLLC, Pinellas Park, for Respondent Jerone Hunter.

September 22, 2023

JAY, J.

We previously granted the State's emergency petition for writ of certiorari. This opinion explains that decision.

I.

In August 2004, Respondents bludgeoned six people to death in Deltona. The Supreme Court of Florida summarized the scene of the murders as follows:

> On the morning of August 6, 2004, a coworker of two of the occupants of a residence on Telford Lane in Deltona, Florida, discovered the victims' bodies. Belanger lived at the Telford residence with Ayo–Roman, Nathan, and Vega. Gonzalez and Gleason happened to be at the house the night of the murders. The six victims had been beaten to death with baseball bats and had sustained cuts to their throats, most of which were determined to have been inflicted postmortem. Belanger also sustained lacerations through her vagina up to the abdominal cavity of her body; the injuries were consistent with having been inflicted by a baseball bat. The medical examiner determined that some of the victims had defensive wounds. A dead Dachshund was also found in the house.

> Following a call to 911, law enforcement officers responded to the scene. The front door had been kicked in, breaking a deadbolt lock and leaving a thirteen-inch shoe-print impression on the door. The victims were found throughout the house and blood was everywhere.

*Hunter v. State*, 8 So. 3d 1052, 1057 (Fla. 2008); *see also Victorino*

2

*v. State*, 23 So. 3d 87, 92–93 (Fla. 2009) (summarizing the same facts).

The jury found Respondents guilty in all six murder counts, and by non-unanimous margins, recommended death sentences in four of the counts. The trial court followed those recommendations, and the Supreme Court of Florida affirmed. *Victorino*, 23 So. 3d at 91; *Hunter*, 8 So. 3d at 1057. However, Respondents later received new penalty phases pursuant to *Hurst v. State*, 202 So. 3d 40 (Fla. 2016) (holding that a court may not constitutionally impose a death sentence unless the jury unanimously recommends it).[1]

On April 10, 2023, jury selection began in Respondents' resentencing proceeding. On April 20, while jury selection continued, the Governor signed into law an amended version of section 921.141, Florida Statutes. The amended statute went into effect immediately and provides that "[i]f at least eight jurors determine that the defendant should be sentenced to death, the jury's recommendation to the court must be a sentence of death." § 921.141(2)(c), Fla. Stat. (2023). Reflecting the state of the law under *Hurst*, the statute previously provided that only a unanimous jury could make such a recommendation. *See* § 921.141(2)(c), Fla. Stat. (2022).

The State moved to apply the amended statute to this case. The trial court ultimately denied the State's motion, concluding that because jury selection had already commenced, using the amended statute would violate Respondents' due process rights. The State sought certiorari relief in this court. For the reasons explained below, we granted the State's petition and directed the trial court to apply the current version of section 921.141.[2]

---

[1] The court later receded from that holding. *State v. Poole*, 297 So. 3d 487 (Fla. 2020) (holding that even if a jury does not unanimously recommend it, a court may constitutionally impose a death sentence if the jury unanimously finds the existence of a statutory aggravating circumstance beyond a reasonable doubt).

[2] After our order granting the State's petition, the trial court granted a mistrial. In a show cause order, we asked the parties if the mistrial mooted any further proceedings in this court. Neither

3

## II.

At the outset, we address Respondents' belief that because this is a death penalty case, the State should have filed its petition in the Supreme Court. Florida law says otherwise. Our constitution provides that the Supreme Court "[s]hall hear appeals from final judgments of trial courts *imposing the death penalty*." Art. V, § 3(b)(1), Fla. Const. (emphasis added); *see also* Fla. R. App. P. 9.030(a)(1)(A)(i) (reflecting the constitutional mandate). Here, the trial court had not entered a final judgment imposing the death penalty, so the Supreme Court's mandatory, exclusive jurisdiction did not attach. *See State v. Matute-Chirinos*, 713 So. 2d 1006, 1008 (Fla. 1998) ("However, our jurisdiction does not include cases in which the death penalty is sought but not yet imposed . . . ." (quoting *State v. Fourth Dist. Ct. of Appeal*, 697 So. 2d 70, 71 (Fla. 1997))); *see also State v. Jackson*, 306 So. 3d 936, 943 (Fla. 2020) (finding that as a result of the vacation of defendant's death sentence, "Jackson analogously stands in the same position as any other defendant who has been convicted of first-degree murder but who has not yet been sentenced").

Moreover, it has long been settled that district courts may lawfully consider challenges to interlocutory orders in death

party thought that dismissal on mootness grounds was appropriate. We agree that because we already ruled on the State's petition, the mistrial does not moot the issuance of this opinion. *See State Farm Fla. Ins. Co. v. Bellamy*, 302 So. 3d 1081, 1082 (Fla. 1st DCA 2020) ("On appeal, a case is moot where, by a change of circumstances *prior to the appellate court's decision*, the judiciary is unable to grant any effectual relief." (emphasis added)); *In re Guardianship of Schiavo*, 932 So. 2d 264, 264 n.1 (Fla. 2d DCA 2005) ("[W]e issued our per curiam decision at a time when this case was not moot and was of great public importance, stating, 'Affirmed; an opinion will follow.' We do not believe that the doctrine of mootness allows us to avoid explaining a decision when it is issued in such an expedited fashion."); *see also Hassoun v. Searls*, 976 F.3d 121, 130 (2d Cir. 2020) ("Because the court's opinion explained its previous order—which addressed a live case or controversy—the opinion was not advisory.").

4

penalty cases. *See State v. Preston*, 376 So. 2d 3, 4–5 (Fla. 1979) ("But the issues in these types of [pre-trial] motions are not unique to capital cases or to the death sentence itself. There is no compelling reason that they cannot be reviewed in the district courts like all other interlocutory matters in the course of a criminal proceeding."); *Gore v. State*, 614 So. 2d 1111, 1113 (Fla. 4th DCA 1992) ("Yet, a decision in this circumstance holding that only the supreme court is competent to pass on this discovery question would undoubtedly, and quite understandably, suggest that our supreme court should be the court of initial review on any number of interlocutory rulings of the trial court in a capital case. That result would embroil the supreme court in every potential death penalty case, before any death penalty has been imposed . . . . There is not a word in either the constitutional provision or the rule on death penalty jurisdiction that suggests that the drafters intended such a result."). Indeed, district courts often do so. *See, e.g.*, *Barahona v. State*, 172 So. 3d 470 (Fla. 3d DCA 2015); *Tyson v. State*, 114 So. 3d 443 (Fla. 5th DCA 2013).

Thus, we reject Respondents' threshold argument that the State filed its petition in the wrong court, and now turn to the merits of the State's petition.

A.

Certiorari relief requires three elements: "(1) a departure from the essential requirements of the law, (2) resulting in material injury for the remainder of the case (3) that cannot be corrected on postjudgment appeal." *Reeves v. Fleetwood Homes of Fla., Inc.*, 889 So. 2d 812, 822 (Fla. 2004) (quoting *Bd. of Regents v. Snyder*, 826 So. 2d 382, 387 (Fla. 2d DCA 2002)). The last two elements—collectively referred to as "irreparable harm"—are jurisdictional in nature. *Citizens Prop. Ins. Corp. v. San Perdido Ass'n*, 104 So. 3d 344, 351 (Fla. 2012). As such, a court considers them before deciding whether the trial court departed from the essential requirements of the law. *Id.* (quoting *Williams v. Oken*, 62 So. 3d 1129, 1132 (Fla. 2011)).

Here, the old statute required the State to convince all twelve jurors that death is the appropriate sentence, whereas the current statute mandates only eight. If applying the old statute

was indeed error, the irreparable harm to the State was obvious because apart from certiorari relief, the State would have no way to recover from the error. *See Wright v. State*, 586 So. 2d 1024, 1032 (Fla. 1991) ("In the context of capital proceedings, the constitutional protection against double jeopardy provides that if a defendant has been in effect 'acquitted' of the death sentence, the defendant may not again be subjected to the death penalty for that offense if retried or resentenced for any reason."); *see also State v. Pettis*, 520 So. 2d 250, 253 n.2 (Fla. 1988) ("The defendant does not suffer the same prejudice [as the State does from erroneous pre-trial rulings] because he always has the right of appeal from a conviction in which he can attack any erroneous interlocutory orders.").

Given the clear nature of the irreparable harm, we now explain why the trial court's refusal to apply the current version of section 921.141 was a departure from the essential requirements of the law.

B.

We first address how an April 2023 statutory amendment can lawfully apply to a proceeding about events from August 2004.

The U.S. and Florida Constitutions forbid the use of ex post facto laws. *See* Art. I, § 9, cl. 3, U.S. Const.; Art. I, § 10, Fla. Const. In short, ex post facto laws criminalize or enhance the criminal penalty for conduct that has already occurred. *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (quoting *Cummings v. Missouri*, 71 U.S. 277, 325–26 (1866)). Thus, a law does not violate the ex post facto clause unless it is retrospective in its effect and alters the definition of a crime or increases the sentence by which the crime is punishable. *Griffin v. State*, 980 So. 2d 1035, 1036 (Fla. 2008) (quoting *Gwong v. Singletary*, 683 So. 2d 109, 112 (Fla. 1996)).

A procedural change—even one that works to a defendant's disadvantage—is generally not an ex post facto law since it does not alter substantive personal rights. *See Dobbert v. Florida*, 432 U.S. 282, 293 (1977); *Shenfeld v. State*, 44 So. 3d 96, 100 (Fla. 2010); *McLean v. State*, 854 So. 2d 796, 803 (Fla. 2d DCA 2003); *see also Harris v. State*, 400 So. 2d 819, 820 (Fla. 5th DCA 1981)

6

(observing that "procedural changes are to be applied to pending cases"). A law is procedural when it alters *how* a criminal case is adjudicated instead of addressing the substantive criminal law. *Collins v. Youngblood*, 497 U.S. 37, 45 (1990); *see also Procedural Law*, *Black's Law Dictionary* (11th ed. 2019) ("The rules that prescribe the steps for having a right or duty judicially enforced, as opposed to the law that defines the specific rights or duties themselves."). Litigants generally have no vested rights in procedural regulations. *Carmell v. Texas*, 529 U.S. 513, 544 (2000) (quoting *Thompson v. Missouri*, 171 U.S. 380, 385 (1898)).

Here, the amendment to section 921.141 is a quintessentially procedural change that has no substantive effect. "The new statute simply alter[s] the methods employed in determining whether the death penalty [is] to be imposed; there [is] no change in the quantum of punishment attached to the crime." *See Dobbert*, 432 U.S. at 293–94. Because the change to section 921.141 "neither alters the definition of criminal conduct nor increases the penalty by which the crime of first-degree murder is punishable[,] . . . it does not constitute an ex post facto law." *See Victorino v. State*, 241 So. 3d 48, 50 (Fla. 2018).

Furthermore, it is irrelevant that the current version of section 921.141 became law after jury selection started. Criminal jeopardy attaches when a jury—not a group of prospective jurors—is sworn. *Knight v. State*, 211 So. 3d 1, 11 (Fla. 2016) ("This [jeopardy] principle does not refer to a venire panel being sworn in to prepare for voir dire, but to the jury of record, which has been selected to hear the case, being sworn in to prepare to hear testimony."). Here, the court did not swear the selected jury until after the current version of section 921.141 became law. The fact that jury selection began on April 10 did not insulate these proceedings from an amendment to a procedural law that took effect before the jury was sworn and heard any evidence.

C.

We now turn to the unusual facts of this case, which put to rest any lingering doubt about whether the application of the current version of the statute would have violated Respondents' due process rights.

7

Respondents' argument is essentially one of detrimental reliance. They maintain that they justifiably conducted jury selection under the assumption that the old version of the statute would apply. However, the record shows that the statutory amendment took no one by surprise.

In their response to the State's motion to use the current version of section 921.141, Victorino's lawyers acknowledged that by March 2023, "all parties were aware that a bill was pending in the Florida legislature seeking to change the death penalty sentencing procedures." Jury selection began on April 10. Victorino's lawyers further acknowledged that "[d]uring this entire process, the Court, State, and the attorneys for Mr. Victorino and Mr. Hunter were generally aware of the progress of the new bill through the Florida legislature."

On April 17, a prospective juror asked about the looming change to section 921.141. The trial judge told the prospective jurors that "I'll be instructing you on what the law is, and so whoever ends up on the jury, before you go deliberate I'll be giving you a whole lot of instructions on the law, and certainly I'll tell you what law applies as far as sentencing." After two jurors indicated they heard about the possible change in the law through national news outlets, the trial judge reiterated that he would instruct the jury on the applicable law:

> So, yeah, there is a debate in the legislature about a lot of laws changing things, but you really shouldn't concern yourself with what they're doing right now.
>
> As far as this case and what applies now, I promise, you know, when this goes to the jury, I'll give you the law on what applies, and you really shouldn't concern yourself about what's being debated right now in Tallahassee.

Jury selection continued. Victorino's lawyers did not conduct

any voir dire of the prospective jurors. In their response to the State's motion, the lawyers reported they took this approach because they wanted to select a jury to try the case as soon as possible—before the new law took effect.

The Governor then signed the amended statute into law on the morning of April 20. When jury selection resumed that day, the State requested a ruling on its motion to apply the new law. The court noted that "we all knew this was going to happen today." The court indicated that jury selection would continue and that it would later decide which version of section 921.141 applied. Hunter's counsel agreed that the case should move forward.

After additional discussion, the State suggested conducting voir dire about the change in the law to ensure the prospective jurors could "still fairly impose life or death." Counsel for Hunter dismissed this suggestion, contending that the current version of section 921.141 could not possibly apply to this case. The court indicated that additional voir dire would take too much time and that jury selection would move on to peremptory challenges.

Discussion ensued about when to swear the selected jury, with the State requesting a delay so that it could pursue appellate remedies related to its motion, and Respondents asking the court to swear the jury immediately. Respondents expressed concern that a delay would allow the State to back strike up to five selected jurors. To alleviate this worry, the State offered to waive all its remaining strikes. However, the court ultimately decided to commence with swearing the jury.

In sum, this record shows that the change to section 921.141 was entirely foreseeable to all parties. The record suggests that both sides were cognizant of the impact the new law would have on this proceeding and tailored their litigation strategies— including the scope and even the existence of voir dire—to maximize the chance that their preferred version of the statute would apply. It is not for us to comment on the reasonableness of those strategic choices made by experienced attorneys, especially given the inevitably distorting effect of hindsight. *See Covington v. State*, 348 So. 3d 456, 466 (Fla. 2022) (noting that when a court is called upon to evaluate a lawyer's performance, the court must

9

make "every effort" to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (quoting *Hayward v. State*, 183 So. 3d 286, 297 (Fla. 2015))). Instead, we only had to decide whether, under the circumstances presented here, there was any due process impediment to applying the current version of a procedural statute to that proceeding. We held there was not.

"The essence of due process is 'reasonable notice and a reasonable opportunity to be heard.'" *A.W. v. Humana Med. Plan, Inc.*, 270 So. 3d 400, 402 (Fla. 4th DCA 2019) (quoting *Citizens of State v. Fla. Pub. Serv. Comm'n*, 146 So. 3d 1143, 1154 (Fla. 2014)). The record before us shows that Respondents received both. They were neither blindsided by the change in the law nor were they denied opportunities to argue why it should not apply to that proceeding or to question prospective jurors about their views on the new law. Due process guaranteed them these rights, but it does not guarantee them success on the merits.

### III.

"Trial courts have the 'responsibility to determine and properly instruct the jury on the prevailing law.'" *Allen v. State*, 324 So. 3d 920, 928 (Fla. 2021) (quoting *Standard Jury Instructions in Crim. Cases (95-1)*, 657 So. 2d 1152, 1153 (Fla. 1995)). To fulfill that role in this case, the trial court should have granted the State's motion to apply the current version of section 921.141.

Because the State showed a departure from the law's essential requirements resulting in irreparable harm, it was entitled to certiorari relief.

LAMBERT, J., concurs and concurs specially, with opinion.
HARRIS, J., concurs in part and dissents in part, with opinion.

10

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____

LAMBERT, J., concurring specially, with opinion.

I fully concur with the majority opinion. In my view, the situation here could have been avoided by the asking of additional questions of the prospective jurors regarding this new statute and how, if at all, it would affect their ability to be fair and impartial.[1] I write separately to address what I view to be a somewhat inconsistent position being taken by one of the respondents.

In 2006, when Victorino and Hunter were tried and convicted in this case of the six first-degree murders that they committed in 2004, the law at the time permitted a jury to recommend the death penalty by a simple majority (7-5) vote. The jury recommended the death penalty for four of these murders, which the trial court imposed. In fact, one of Victorino's death penalty sentences followed a 7-5 recommendation by the jury.

After the Florida Supreme Court's decision in *Hurst*, discussed in the majority opinion, and the statute subsequently enacted by the Legislature in response to require unanimity from the jury before a death sentence could be imposed, Victorino filed a successive Florida Rule of Criminal Procedure 3.851 motion for postconviction relief to vacate his death sentences. The lower court vacated Victorino's death sentences; and it ordered a new penalty phase trial, which awaits below.[2]

---

[1] I am not unsympathetic to the trial judge and the unusual predicament that he faced. Having presided over several death penalty trials when I was a circuit judge, I know that they can be difficult, stressful, and time-consuming, especially where, as here, a mistrial is subsequently declared by the judge and the entire trial process necessarily starts over.

[2] Hunter also sought postconviction relief under *Hurst* and the lower court vacated his death sentences as well.

Victorino was not, however, entirely successful in his postconviction motion. He had also argued that because his first jury did not unanimously recommend the death penalty on any of the counts for which the death sentence was imposed, he was entitled to be resentenced to serve life in prison under section 775.082(2), Florida Statutes, and the trial court erred by instead ordering the new sentencing phase trial. On appeal, Victorino pointedly asserted that to "apply the recent, post-*Hurst* case law retroactively to make [him] death-eligible would violate the constitutional prohibitions against ex post facto laws." *Victorino v. State*, 241 So. 3d 48, 50 (Fla. 2018).

The Florida Supreme Court flatly, and unanimously, rejected this argument, explaining:

> For a criminal law to be ex post facto it must be retrospective, that is, it must apply to events that occurred before its enactment; and it must alter the definition of criminal conduct or increase the penalty by which a crime is punishable. *Lynce v. Mathis*, 519 U.S. 433, 441, 117 S. Ct. 891, 137 L. Ed. 2d 63 (1997). Florida's new capital sentencing scheme, which requires the jury to unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that sufficient aggravating factors exist to impose death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death before the trial judge may consider imposing a sentence of death, *see* § 921.141(2), Fla. Stat. (2017), neither alters the definition of criminal conduct nor increases the penalty by which the crime of first-degree murder is punishable. Thus, it does not constitute an ex post facto law, and Victorino is therefore not entitled to relief.

*Id.*

Now, five years after the supreme court's opinion in his own case, Victorino has an entirely different view of the former statute that required the unanimous verdict for the death penalty. He no longer contends, as he did then, that it would be a violation of the constitutional prohibitions against ex post facto laws to apply this since-repealed statute in his upcoming sentencing phase retrial. Quite the contrary. Victorino instead argues that it would be an ex post facto violation if this former statute is not used.

To provide further context pertinent to the issue here, the Florida Supreme Court's opinion in *Hurst*, which, as previously stated, directly led to the Florida Legislature's enactment of the aforementioned unanimous verdict statute, was receded from by the court in *Poole* in 2020. 297 So. 3d at 491. The repealed "unanimous verdict" statute, which the respondents argue should apply in their sentencing phase retrial, was enacted thirteen years *after* they committed their first-degree murders and eleven years *after* they were convicted. But for *Hurst*, which the Florida Supreme Court specifically determined in *Poole* was wrongly decided, 297 So. 3d at 506, the respondents would not be having the instant sentencing phase retrial.

Moreover, the current statute requiring a jury vote of 8-4 prior to the imposition of the death penalty, the use of which the respondents complain violates the constitutional prohibition against ex post facto laws, arguably makes it more difficult for the State to obtain a jury verdict recommending the death penalty than when the respondents were first convicted and sentenced in 2006 when the "7-5" statute was in effect. Under these circumstances, and in light of the Florida Supreme Court's opinion in *Victorino* cited above, the respondents' position that they are constitutionally entitled to have their sentencing phase retrial under the former statute lacks merit.

14

HARRIS, J., concurring in part, dissenting in part.

I remain in full agreement with the majority's legal analysis and conclusion that the trial court erred in refusing to apply the new version of section 921.141, Florida Statutes. However, erroneous rulings below combined with the questionable legal tactics of trial counsel created a legal quagmire for which I would find the remedy afforded by granting certiorari wholly inappropriate.

As the majority correctly points out, jury selection in this resentencing trial began two weeks before the new statute went into effect. During that time, approximately 200 potential jurors were questioned regarding, among other things, their feelings about the death penalty and whether they would be able to recommend a sentence of death under the appropriate circumstances. During this process, the prospective jurors were repeatedly advised by the trial judge that it would take the vote of all twelve jurors in order for the court to impose a death sentence. A panel of jurors was ultimately "death qualified," selected, and sworn. However, when they expressed their ability and willingness to follow the law, they did so with the clear understanding that unanimity would be required before the Respondent could receive a death sentence. We do not know, partly because the trial court refused to allow additional questioning of the jurors, if their answers during voir dire would have been different had they known that only two-thirds of them would need to recommend a death sentence as opposed to all twelve. We do not know, for the same reason, whether any reservations, issues, or concerns they may have with the death penalty would have been affected if they were advised that only eight of them would be needed to make that recommendation. The problems created by application of the current law could have been remedied by simply allowing limited additional questioning of the jurors or by starting the selection process over.

15

Because "death is different," I cannot join that portion of the majority opinion that would have directed the trial court to proceed with this trial and this particular jury under materially different ground rules on such a critical issue.